(C. D. 1698)

CHEMICAL SPECIALTIES CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 5, 1955)

*Richard G. Green* for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Joseph E. Weil*, trial attorney), for the defendant.
*J. Joseph McDermott* as *amicus curiae*.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in this case consists of a substance known as 21-acetoxy pregnenolone, a steroid, which was classified under paragraph 5 of the Tariff Act of 1930 as a medicinal preparation and assessed with duty at the rate of 25 per centum ad valorem. It is claimed properly dutiable at the rate of 5 per centum ad valorem under paragraph 34 of the act, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as a drug, advanced, either directly or by virtue of the similitude provision of paragraph 1559 of the tariff act. Reference to the pertinent provisions of the act will be made as the discussion of the controversy requires.

The process employed in the manufacture of the imported material is described in a stipulation entered into between counsel for the respective parties (plaintiff's exhibit 1).

Plaintiff called but one witness, Dr. Gregory Pincus, director of research in physiology and biochemistry at the Worcester Foundation for Experimental Biology, Shrewsbury, Mass., and research professor of biology at Boston University.

The witness testified that he, and other research workers under his supervision and direction, had found infinitesimal traces of a substance known as 21-hydroxy pregnenolone in human blood, taken from a blood bank, and also in human urine, and in synovial fluid, i. e., the fluid taken from the knee joint of a patient. This same substance

he also discovered in adrenal gland tissue, and "in blood which had passed through the adrenal glands that are maintained functional outside of the body." (R. 17.)

Dr. Pincus further testified concerning a number of experiments that he conducted with 21-hydroxy pregnenolone and 21-acetoxy pregnenolone, the imported material.

With respect to the claimed classification, plaintiff's witness testified that on the basis of the work done under his supervision, 21-acetoxy is a form of 21-hydroxy pregnenolone, "a further processing of the first drug" (R. 42), "advanced over the 21-hydroxy pregnenolone" (R. 43). He stated that both 21-hydroxy pregnenolone and 21-acetoxy pregnenolone are drugs having medicinal properties.

The stipulation, heretofore referred to (plaintiff's exhibit 1), describes the imported merchandise as "a steroid having a hormonal action." Dr. Pincus explained that steroid hormones all have a certain characteristic chemical structure in common, namely, the possession of the so-called "steroid nucleus," which consists of three benzene rings and a pentacyclic, or five-sided ring, and that the imported material possesses this steroid nucleus; that, structurally, the only difference between the imported material, 21-acetoxy pregnenolone, and 21-hydroxy pregnenolone is in the presence of an acetate group at the 21 position of the molecule in the acetoxy pregnenolone, whereas, in the 21-hydroxy pregnenolone, there was present instead of the acetate at that position an "OH" or hydroxyl group (R. 54), as indicated in the process described in plaintiff's exhibit 1. As to the use of the two pregnenolone substances, the witness testified that 21-acetoxy pregnenolone acts with more effectiveness, i. e., a greater length of time, in causing the retention of salt.

Defendant called three witnesses. The first to testify was Dr. Emanuel B. Hershberg, codirector of research at Schering Corp., manufacturer of pharmaceuticals and hormones. This witness stated that he was familiar with the yam, cabeza de negra (the basic material from which the imported product is processed), having studied its source, and that he had obtained some specimens in Mexico. He described the plant as a "bulbous root." He likewise had studied the manufacture of the imported merchandise, "as well as the other hormones," and stated that, in his opinion, the imported material was a hormone (R. 106).

In substance, defendant's witness Hershberg testified that, in the various processes outlined in plaintiff's exhibit 1, new elements were added to the saponin extracted from the cabeza de negra root, all being chemical reactions, the end result being that "the acetate has been added to the structure of the pregnenolone to form 21-acetoxy pregnenolone," and that such addition is a "necessary part of the process" to produce the end material (R. 157). In his opinion,

21-acetoxy pregnenolone, the imported material, is a product that has been artificially produced, and "it is not a natural product" (R. 158). He testified further that, physically and chemically, the steroid diosgenin, as well as the steroid saponin, is different from the imported steroid, 21-acetoxy pregnenolone.

Defendant's second witness, Dr. Lewis H. Sarett, was the director of the Department of Medicinal-Chemical Research of Merck & Co., Inc., manufacturer of fine chemicals, therapeutic drugs, and other chemicals. It was stipulated between counsel for the respective parties that the testimony of this witness as to the nature and composition of the imported material would be the same in all material respects as that given by Dr. Hershberg.

Edson F. Woodward, licensed pharmacist and chief pharmacognosist with S. B. Penick & Co., importer and exporter, and supplier of basic materials to the pharmaceutical and allied industries, the final witness called by the defendant, defined "natural" drugs as "those which are obtained from nature from plants or animals" (R. 197). He testified that he had handled drugs, such as those enumerated in paragraphs 34 and 1669, *supra*; that he had analyzed them and had supervised analyses of such drugs made by others. He stated that the drugs listed in said paragraphs are natural drugs (R. 198). The witness stated that, in his opinion, the imported material, 21-acetoxy pregnenolone, while a drug (R. 228), is not a "natural" drug (R. 219).

Defendant also introduced in evidence samples of the yam root, cabeza de negra, in various· stages, namely, sliced, chipped, and ground (defendant's illustrative exhibits B, C, and D) (R. 111–114), together with a jar containing a white powderish substance (illustrative exhibit E) which defendant's witness, Hershberg, identified as diosgenin obtained from the cabeza de negra (R. 137–138).

The plaintiff does not assert that the imported material, 21-acetoxy pregnenolone, as such, is found in the powdered yam, but maintains that "the steroid nucleus is there" and that the imported merchandise "is an advanced form of what is in the steroid nucleus." It further contends that, because 21-hydroxy pregnenolone is a material found in nature, and 21-acetoxy pregnenolone is an advanced form of 21-hydroxy pregnenolone, the imported material is properly dutiable as an advanced drug, "natural" and "uncompounded," as claimed (R. 87). Counsel for the plaintiff further concedes that 21-hydroxy pregnenolone is not found in the dried yam powder but maintains that the dried yam powder is something more than mere material from which 21-acetoxy pregnenolone is manufactured, because it has the basic steroid nucleus, "which is the essential characteristic of 21-acetoxy pregnenolone, and of all other steroid hormones" and that "these other things are simply advancements of the basic drug"

(R. 88). It is the further contention of the plaintiff that "the imported material need not be of the same origin as the product that is found in nature so long as it is the same or an advanced form of that" (R. 91).

The defendant, on the other hand, contends that the imported material is not a "drug," advanced, as contemplated by paragraph 34, *supra,* under which plaintiff claims, because the yam or root, cabeza de negra, from which the imported merchandise was obtained, never existed as a crude drug; that "the root would still have to have therapeutic or medicinal property to be a crude drug" (R. 11, 12); and that, in the production of the imported 21-acetoxy pregnenolone, an entirely different product is obtained, which has therapeutic and medicinal properties, but only as the result of certain processes to which the original product is subjected (R. 101).

The issue in the case at bar is then whether the imported product is a drug, "natural" and "uncompounded," advanced in value or condition, within the contemplation of paragraph 34 of the Tariff Act of 1930.

Paragraph 34 of the Tariff Act of 1930, under which plaintiff claims the imported merchandise is properly classifiable, provides for "Drugs, *such as* barks, beans, * * * and all other drugs of vegetable or animal origin; any of the foregoing which are *natural* and *uncompounded* drugs * * *, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture." [Italics supplied.]

In our opinion, the provision for "natural" drugs in paragraph 34, *supra,* of the tariff act embraces only those of a definite class or kind, i. e., such as are found as drugs in nature and which have been advanced in value or condition beyond their natural state. To be dutiable under paragraph 34, therefore, products claimed to be drugs must be of the same class or kind as those enumerated in said paragraph. A review of the legislative history of the paragraph in question confirms this conclusion. See Tariff Act of 1890 (paragraph 24); Tariff Act of 1922 (paragraph 34); Summary of Tariff Information, 1929, volume 1. In the latter publication, page 165, there appears the following:

The term drug, as used in paragraphs 34 and 1567, embraces expressly and by implication a large number of plants and parts of plants, and a smaller number of animals and parts of animals, used chiefly for medicinal purposes, rather than as foodstuffs.

The new language introduced into paragraph 34 of the Tariff Act of 1922, namely, "all other drugs of vegetable or animal origin," as

appears from a study of the legislative history, was intended merely to include certain new natural drugs of animal origin (pituitary glands, dried ox gall, and thyroid and various other glands). It was not the intent of the Congress to include within the provision for "natural" drugs any other products than the types of articles expressly named. Paragraph 34 for advanced drugs, as it appears in the Tariff Act of 1930, is a reenactment in identical language of the immediate predecessor tariff provision.

Evidently, the plaintiff herein contends that when Congress added the words "and all other drugs of vegetable or animal origin" in paragraph 34 of the Tariff Act of 1922 it intended to augment the types of "natural" drugs included in the tariff act. It contends that drugs synthesized from vegetable or animal materials, even though such drugs are not "natural" within the common acceptation of that term, are now included as "natural" drugs. Such an interpretation, however, ignores the express limitation in paragraph 34, *supra*, that drugs to be included therein must be natural.

The imported material in the case at bar, 21-acetoxy pregnenolone, is not a "natural" drug within the contemplation of paragraph 34, *supra*, of the tariff act. The processes indicated in the production of the imported merchandise show that it is manufactured by a series of chemical reactions wherein new chemical compounds and intermediates are formed. This material in its condition, as imported, is itself a new and different compound from that of any of its predecessor combinations and is unlike the advanced drugs named in the pertinent paragraph.

In his brief, plaintiff's counsel argues that "It is clear from all the cases that the determination as to whether a drug is natural and uncompounded is based less on chemical identity than on functional identity," citing *Sherka Chemical Co., Inc.* v. *United States*, 33 C. C. P. A. (Customs) 53, C. A. D. 316. The merchandise there involved, however, was "potassium oestradiol solution," consisting of a mixture of "alpha-oestradiol," an estrogenic hormone identical with the natural female hormone, "beta-oestradiol" (practically impotent), and potassium hydroxide.

The issue in the *Sherka* case, *supra*, was not the same as that in the case at bar. The holding in that case turned upon the construction to be given to the term "drug," as used in the tariff act. The question as to whether the merchandise was a medicinal preparation was not raised in the cited case. Here, the competition is between a "drug," advanced (paragraph 34), and a "medicinal preparation" (paragraph 5). The *Sherka* case is also distinguishable from the present case in that the therapeutic or medicinal properties in the im-

ported drug in that case were the same as those found in the drug in its natural state. This is not so in the case at bar.

The cases of *Roche-Organon, Inc.* v. *United States*, 35 C. C. P. A. (Customs) 99, C. A. D. 378; *United States* v. *Judson Sheldon Corp.*, 33 C. C. P. A. (Customs) 73, C. A. D. 318; *United States* v. *Magnus, Maybee & Reynard, Inc.*, 39 C. C. P. A. (Customs) 1, C. A. D. 455; and *G. D. Searle & Co.* v. *United States*, 21 Cust. Ct. 112, C. D. 1138, likewise cited in plaintiff's brief, are equally distinguishable from the case at bar. In all the cases cited above, the therapeutic and medicinal properties in the imported products were the same as those found in such substances in their natural state.

The process or treatment contemplated by paragraph 34 of the tariff act so as to bring a crude drug (paragraph 1669) within its provisions is one which advances an existing drug in value or condition. In the process of synthesizing, heretofore described, however, the source material, the cabeza de negra, is completely destroyed and its identity lost. The product here imported is not an advancement of its predecessor material but is itself a distinct chemical entity.

Plaintiff also cites *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30, T. D. 40865, and *Synthetic Patents Co., Inc.* v. *United States*, 12 Cust. Ct. 148, C. D. 845. These cases are also distinguishable from the case at bar, either because, unlike the merchandise here involved, the products there obtained were merely advancements of a drug in its crude state or involved issues other than those now before us.

In *Lehn & Fink* v. *United States*, 4 Ct. Cust. Appls. 325, T. D. 33522, our appellate court had before it the question whether sirup of rhamnus, obtained from a berry plant, and two similar extracts derived from certain roots, were properly dutiable as medicinal preparations, as classified, or as natural uncompounded drugs, as claimed. In upholding the classification, the court, page 326, stated:

* * * In the process of manufacture the physical properties and distinguishing characteristics of the roots and berries from which the infusions, decoctions, and extracts are made were lost so completely that in no sense could the latter be properly called "drugs, such as barks, beans, berries, * * * roots," and so forth. Paragraph 20 does provide for certain enumerated drugs "advanced in value or condition by any process or treatment whatever." Nevertheless the limitation of the paragraph to natural drugs makes it clear, we think, that there was no intention to extend its provisions to drugs artificially produced or to manufactures of such natural drugs. * * *

The rule announced in the *Lehn & Fink* case, *supra*, is applicable with equal force and effect to the merchandise at bar. Here, the imported product, 21-acetoxy pregnenolone, is a manufactured substance, one which has been artificially produced by a series of chemical reactions. Its therapeutic properties were not present in the natural

source, cabeza de negra, but were only the result of the chemical processes here employed. The imported product is not a "natural" drug.

A further limitation in paragraph 34, *supra*, is that the drugs provided for therein must be "uncompounded," and the plaintiff has the burden of establishing that the imported 21-acetoxy pregnenolone is not a compounded product. This court and our appellate court on numerous occasions have passed upon the question as to what constitutes a "compounding."

In *Kachurin Drug Company* v. *United States*, 24 Cust. Ct. 264, C. D. 1246, affirmed in *United States* v. *Kachurin Drug Company*, 39 C. C. P. A. (Customs) 36, C. A. D. 459, the merchandise consisted of ammonium ichthosulfonate derived from bituminous schists, from which a crude oil was obtained by heating, and which was subsequently treated with sulfuric acid, neutralized with ammonia, and finally concentrated to proper consistency. In holding the merchandise dutiable as a medicinal preparation, this court, at page 269, stated:

It is not a natural product but one artificially produced. Treating the distilled oil with sulfuric acid, developed one chemical combination, and then neutralization thereof with ammonia produced another substance. The combined treatment conforms to the common meaning of "compound," i. e., "to make up by intermingling or intimate combination of various elements or ingredients; combine or intermix so as to form a composite product." (Funk & Wagnalls New Standard Dictionary.)

The processes produce a "compound" within the interpretation given in *United States* v. *Davies, Turner & Co.*, 5 Ct. Cust. Appls. 196, T. D. 34325, wherein the court said that "There must be some artificial mixture of chemicals or artificial compounding of substances to produce a chemical compound."

That the present merchandise is compounded and artificially produced, removes it from classification as a drug under paragraph 34, *supra*, which specifically provides that substances shall be "natural" and "uncompounded."

In the same case, the court further stated:

The *Sherka Chemical Co., Inc.*, case, *supra*, cited by plaintiff to support its position, is distinguishable. There, the therapeutic alpha-oestradiol existed in the imported solution in the form as extracted from its original source. Here, a manufactured chemical product, with a therapeutic agent giving it medicinal value, has been manufactured.

As to what constitutes a "compounding," see also *Strohmeyer & Arpe Co.* v. *United States*, 2 Ct. Cust. Appls. 285, T. D. 32035, and *McKesson* v. *United States*, 1 Ct. Cust. Appls. 213, T. D. 31256.

As tested by the foregoing standards, the imported merchandise is not "uncompounded" and, accordingly, is precluded from classification under paragraph 34, *supra*, as a drug, advanced, which is natural and uncompounded.

Merchandise is classifiable in the condition in which imported. *United States* v. *Yardley & Co., Ltd.*, 16 Ct. Cust. Appls. 499, T. D.

43226. The merchandise with which we are here concerned is 21-acetoxy pregnenolone, not 21-hydroxy pregnenolone. No proof has been adduced establishing that 21-acetoxy pregnenolone is found in nature, and the record is indisputable that the imported merchandise is a manufactured product. The preponderance of the evidence in this case supports the collector's presumptively correct classification.

Plaintiff also contends that, if the imported merchandise is not dutiable directly as an advanced drug (paragraph 34, *supra*), it is dutiable as such by virtue of the similitude provision of the tariff act (paragraph 1559). In view of our finding herein, however, that the imported product is a medicinal preparation, and, as such, is provided for in the tariff act, the similitude provision, which applies only to such articles as are not enumerated therein, is inapplicable to the imported merchandise. *P. Silverman & Son* v. *United States*, 32 C. C. P. A. (Customs) 99, C. A. D. 292.

Further, plaintiff's contention that the similitude provision of the act is applicable herein because the imported material, 21-acetoxy pregnenolone, has the same biological effect as 21-hydroxy pregnenolone and other naturally occurring hormones, in that all cause salt retention, as indicated by experimental tests, is untenable. The record fails to establish that 21-hydroxy pregnenolone, the claimed "similar" product, as a commercial product, was ever used for medicinal or therapeutic purposes, whereas, the testimony of plaintiff's own witness is that the imported merchandise was so used (R. 71, 85). Classification by similitude of use is not established by a mere showing of general usage of two comparable products. *Mary G. Ricks* v. *United States*, 33 C. C. P. A. (Customs) 1, C. A. D. 308. The plaintiff in this case has failed in its burden of establishing substantial similitude of the imported material to drugs, advanced.

Plaintiff's alternative claim that the rule of long-continued administrative practice requires classification of the merchandise in question as a drug, advanced in value or condition, under paragraph 34, *supra*, is likewise without merit. The rule has been laid down that "for administrative practice to be even persuasive in a case, it must be proved to have been known, long continued, uniform and general." *Rapken & Co., Ltd.* v. *United States*, 25 C. C. P. A. (Customs) 268, 274, T. D. 49393. There is nothing in the present record to support a factual finding that merchandise of the character here imported was ever classified as a drug, advanced in value or condition, under the claimed paragraph of the tariff act.

For the aforesaid reasons, we hold the imported merchandise properly dutiable under paragraph 5 of the Tariff Act of 1930 at the rate of 25 per centum ad valorem as a medicinal preparation, as classified. The protest is overruled. Judgment will issue accordingly.