(C.D. 2303)

ORGANON, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided December 13, 1961)

*Eugene R. Pickrell* (*Richard F. Weeks* of counsel) for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Murray Sklaroff* and *Richard E. FitzGibbon*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the cases at bar, which have been consolidated for trial, invoiced as "Heparin Sodium USP XV," was classified under paragraph 5 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 12½ per centum ad valorem, as a medicinal preparation, not specially provided for. Plaintiff claims the merchandise properly free of duty under paragraph 1669 of the said act as a crude drug, or, in the alternative, dutiable under paragraph 34 of the act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at the rate of 5 per centum ad valorem as a drug, advanced in condition. It appears that the substance under consideration is used medicinally for the purpose of retarding the clotting of human blood.

The pertinent paragraphs of the tariff act here under consideration are as follows:

Paragraph 5, as modified by T.D. 52739, *supra*:

All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for * * *_____ 12½% ad val.

PAR. 1669. Drugs such as barks, beans, berries * * * and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided,* That no article containing alcohol shall be admitted free of duty under this paragraph.

Paragraph 34, as modified by T.D. 51802, *supra*:

Drugs, such as barks, beans, berries, * * * and all other drugs of vegetable or animal origin * * *; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol_____ 5% ad val.

A sample of the finished product made from the imported material and which is offered on the market to doctors was received in evidence as plaintiff's exhibit 3 (R. 62). The parties herein stipulated that heparin is usually obtained from the liver or lungs of domestic mammals used for food by man; that heparin contains no alcohol; that it is inedible (R. 11).

There was received in evidence a deposition of Berend Drenth, factory chemist employed by the exporter, who supervised the production of the importation here involved. Attached to said deposition is a so-called "Flowsheet" (exhibit A) showing the production of "Heparin USP XV" obtained from the original heparin as contained in certain animal tissues.

The flowsheet, above referred to (exhibit A), describes the manufacturing process for heparin USP as follows:

### FLOWSHEET OF THE MANUFACTURING PROCESS FOR HEPARIN
#### (U.S.P.) PART I

Mincing and grinding of frozen beef lung.

Coagulation of ground lung.

Proteollytic digestion of the coagulated lung.

Preparation of a precipitate from the digested lung, by lowering the $_pH$ to 2,5–2,6 by means of 3 N. hydrochloric acid.

Filtration and washing of the precipitate at a temperature of} discard 75–80°C. } filtrate

Suspending of the precipitate in 5% (w/v) Na Cl solution, the $_pH$ is adjusted to 8,0 by means of 15% sodium hydroxyde.

Boiling of the suspension after adjusting the $_pH$ to 6,6 by means of 3 N. hydrochloric acid.

Filtration and washing of the precipitate at a temperature of} discard 95–100°C. } precipitate

Concentration of the combined filtrates by evaporation in a vacuum still till ¼ of the starting volume.

Boiling of the solution after addition of charcoal and filteraid.

Filtration and washing of the precipitate at a temperature of} discard 95–100°C. } precipitate

Addition of methanol to the combined filtrates so that the final concentration thereof becomes 40% (v/v).

Filtration and washing of the precipitate after addition of hyflo} discard supercell (filteraid) } filtrate

Precipitate is forwarded to Department I

Plaintiff's witness Drenth testified in the aforesaid deposition substantially as follows: That the merchandise here imported meets the specifications for heparin or heparin sodium as described in the United States Pharmacopoeia (R. 17); that neither the chemical composition nor the structural formula of heparin, from which "Heparin Sodium USP XV" was derived, was determined by him (R. 16); that he did not personally investigate whether or not heparin sodium XV is formed as such in animal tissue (R. 17). He further testified that the tissue of mammals contains sodium in varying amounts, depending on its source, from dog lung, rabbit lung, or

human lung (R. 18); and that there is enough sodium in the tissue of beef lung to contain about 13 per centum of sodium (R. 20). This latter conclusion was apparently based upon statements made in the literature which the witness had read upon the subject.

In response to cross-interrogatories, Mr. Drenth stated that "The whole process is a physical one. It is aiming at a concentration of the active principles by removing several inactive impurities" (R. 22). Plaintiff's witness further testified:

A. As Heparin (Heparin Sodium) is a mixture of sulphated mucopolysaccharides (see M. Stacey, Advances in Carbohydrate Chemistry 2, 181, 1946) and it is present as such in the basic material, these substances should not be hydrolized nor undergo any other chemical change, otherwise the biological activity can be lost or diminish. (R. 23.)

The answers to the questions propounded to this witness as to the nature of the "basic" material used in the production of the imported product were somewhat ambiguous, as disclosed by the record herein. As to whether the commodity here imported was "that very same Heparin Sodium found in animal tissues, or whether the sodium in that merchandise is obtained from some other source, such as materials which are added during the course of the procedure described" in the "Flowsheet" (exhibit A), plaintiff's witness responded:

A. I do not know if the Sodium in the Heparin Sodium or Heparin can be exchanged with the Sodium from Sodium compounds used during the isolation of the Heparin Sodium or Heparin from the animal tissue, as I did not undertake experiments with radio-active Sodium to prove this.

Mr. Drenth stated that his answers to questions concerning the chemical composition of heparin, from which heparin sodium XV is derived, and also as to the chemical composition of heparin sodium USP XV were "taken from" the United States Pharmacopoeia, 15th edition (R. 26).

A deposition of Johannes Post, also factory chemist in the plant of the exporter, recited conclusions substantially the same as those given by the witness Drenth concerning the nature of the heparin contained in the basic material and the characteristics of heparin sodium USP XV, as here imported. This witness also admitted that his statements in this connection were based upon readings in the United States Pharmacopoeia. Attached to this second deposition is another flowsheet, describing the production of the imported merchandise (exhibit B).

At the trial, Dr. Seymour Z. Lewin, professor of chemistry at New York University, testified on behalf of the plaintiff. Dr. Lewin, who received the degree of doctor of philosophy after majoring in physical and analytical chemistry, now teaches in the latter field. The witness stated that, for the past 5 years, he has been engaged in the study, research, and teaching of the subject heparin, in connection with which

he had supervised various experiments covering such material (R. 32–34).

Dr. Lewin further testified that the heparin molecule is a basic sugar type, the structure consisting of a long chain of links, each of the links being a polymer forming the polymeric chain. "Each of the links in the chain, each of the saccharide links, has various substituents attached to it. The muco in the name, mucopolysaccharide, which describes heparin, comes from the fact there is a nitrogen atom attached in the various places in these saccharide units," many of these nitrogen groups having sulphate groups attached to them. Dr. Lewin stated that in the animal tissue, from which heparin comes, protein molecules are attached to the end of the chain of saccharide units. The protein molecule differs chemically from the mucopolysaccharide chain (R. 36–37). Describing the process which takes place in the separation of the USP material from the natural source as it appears in the tissue, plaintiff's witness testified as follows:

* * * The chemical structure of the heparin chain is not affected at all by the hydrolysis step, this protein removal step. * * * [R. 38.]

Dr. Lewin further stated that when the body uses heparin, the enzymatic processes that occur in the body release this molecule. Detailing the process by which the imported heparin was produced, Dr. Lewin testified:

Essentially the flowsheet involves treating the tissue in which the heparin is stored by an enzyme which breaks up the protein substrate and releases the heparin, the long polymeric chain of heparin, by severing its point of attachment to the protein. The rest of the steps in the flowsheet are simply means for physically separating this released heparin polymer from the other impurities that are present along with it. [R. 40–41.]

Plaintiff's witness further stated that proteinaceous material, such as contained in the heparin before separation, will destroy the activity of the heparin, unless thoroughly dried and/or refrigerated at very low temperature. Dr. Lewin expressed the opinion that the process involved in the production of the heparin under consideration, as described in the flowsheet, "is nothing but a separation process of the desired components from the undesired substrate" unchanged from that which occurs in the natural state (R. 46) and that such process is an essential step in preserving the material, which, however, might also be obtained by "suitable refrigeration or other preservative techniques" (R. 47). Dr. Lewin further testified that the involved commodity, in the condition in which it is imported, is a "chemical compound," but that the heparin that is imported is subjected to further compounding after importation (R. 48).

On cross-examination, Dr. Lewin testified that, in the process employed in the production of the imported commodity, indicated in the step shown on exhibit A as "proteolytic digestion," the enzyme serves

to cause the elements of water to "add across the bond between the end of the heparin molecule and the beginning of the protein substrate"—a process known as hydrolysis—and "the end of the heparin molecule released, acquires the same configuration as the remainder, as all the other links in the chain." (R. 48–49.) By the addition of the H or OH radical, the protein then acquires at the point where the heparin protein bond had been, "the configuration of the normal unbonded protein" (R. 49). In explanation, Dr. Lewin further testified that the starting combination of protein and heparin has a particular chemical configuration, which is a chemical substance, and that "You break that up by adding the element of water, and you have two chemical substances in place thereof, one the protein itself, and one the heparin portion"; that the heparin molecule remains intact, after the removal of the protein; and that the removal of the protein "doesn't change the properties of the basic molecule" (R. 51). The record discloses the following, with respect to the heparin in combination with the protein:

X Q. You must have a splitting off of the heparin molecule in order to get something with physiological properties?—A. Yes, at some stage, and if you don't do it, then the body does it for you.

X Q. Doesn't the proteolytic digestion imply breaking down of proteinaceous substances?—A. Yes.

X Q. So that you are actually breaking down proteins in order to extract or provide heparin which can then be removed from your reaction mixture?—A. Yes, although there is only one break when opening up of the protein chain is necessary, and that is the one at the point where the protein is connected to the heparin * * *. (R. 51–52.)

Dr. Lewin described "hydrolysis" as "a reaction that involves the addition of the elements of water across a chemical bond," and then agreed that "It is certain [sic] a chemical change" (R. 53–54). He further testified that whether only one end of the heparin structure is attached to the protein, or whether "Some of the heparin is attached at both ends," as sometimes appears to be the case, in each case, it is necessary to subject the heparin as it occurs in the tissue to a hydrolysis to get out the heparin portion (R. 55).

Plaintiff called as its next witness Mr. Joseph Plamaccio, production manager of Organon, Inc. It appears that the witness is responsible for all manufacturing and packaging operations of Organon products, including heparin. Testifying as to certain operations performed after importation of the involved heparin sodium, Mr. Palmaccio stated as follows: That the material is sampled in the importer's quality control laboratory to establish that it conforms to the U.S.P. specifications for heparin sodium (R. 60), after which it is released for manufacturing purposes, when it is then "compounded by preparing an aqueous solution containing a redissolved combination of alcohol and sodium chloride, which is used to make

the solution isotonic," since "this material is to be used intravenously"; that the heparin sodium is dissolved to this solution in a specific concentration and then filtered to remove any foreign matter from it, after which a sample of the solution is tested to determine whether the solution conforms to standards and concentrations. Thereafter, the sample is released and undergoes further filtration to render it sterile (R. 60–61); that the resulting solution is filled into vials or ampoules, which are individually inspected to determine the presence of any foreign matter; and that samples of the filled containers are further tested to determine that they meet the specifications for the product. If found satisfactory in all respects, the material is packaged for distribution to the trade (plaintiff's exhibit 3) (R. 61–62).

The record, on cross-examination, discloses the following testimony of plaintiff's witness Palmaccio:

By Mr. Sklaroff:

X Q. What you are trying to tell us is that after importation you subject this to rigid control in the manufacture of the solution for injection, is that so?—A. Yes.

X Q. Isn't it good practice to subject all drugs to rigid control, all medicinal preparations to a rigid program of control?—A. Yes, it is.

X Q. So that is not unusual just in the case of heparin?—A. Not as such.

X Q. That is good practice generally?—A. Yes.

X Q. And this business of dissolving in solution and adding a preservative, is that peculiar to heparin?—A. Not necessarily. It is necessary to put heparin into a form whereby it can be administered and achieve the desired physiological effect.

X Q. But not peculiar to heparin?—A. No, there are other products similarly treated to achieve the desired physiological effect.

X Q. Dissolved in solution?—A. Yes.

Defendant called as its witness Dr. John Day, in charge of research and development with Merck & Co. at the Danville, Pa., plant. The record discloses that he is a graduate chemist, with a doctorate degree from the University of Minnesota. Dr. Day, who stated that he was familiar with the term "proteolytic digestion," described it as "an operation in which simply a protein is ruptured so that it would be more than one fragment from one given original protein"—"it is the addition of water across the peptide bond of a protein, or proteinaceous material" (R. 67). The witness testified that the proteolytic digestion is a "tool" of chemical reaction, that is, that chemical substances are created in the process of proteolytic digestion (R. 67), wherein the elements of the molecule $H_2O$ are added to a peptide bond, which the witness stated is the name of a "characteristic bond occurring in proteins, a proteinaceous material" (R. 69).

As opposed to the testimony of plaintiff's witness Drenth, Dr. Day testified that there are chemical changes and not merely physical changes in the process employed in the production of the imported material. In this connection, defendant's witness stated as follows:

A. First, proteolytic digestion is without question a step involving a chemical change. In my opinion, the lowering of the ₚH to 2,5–2,6 definitely hydrolyzes some peptide linkages.

Q. That is that step just of a proteolytic digestion?—A. Yes, the combination of two steps, whereby the ₚH is adjusted to 8, and then again lowered to 6,6 by means of 3 normal hydrochloric acid. The flip-flop between those two steps, in my opinion, will affect hydrolysis of peptide linkages if any remain at that point.

Q. It is your statement that hydrolysis of peptide linkages is a chemical change?—A. Yes.

Q. Any other place on there that you might see a chemical change?—A. The question to which you were alluding earlier, whether going from the free acid to the sodium salt is a chemical change, it is certainly a chemical change in the strict definition of the word "chemical change".

Q. Do you see that any place on either of these flowsheets "A" or "B"?—A. Line 4, following the precipitation where they have lowered the ₚH from 2,5 to 2,6, the sulfonic acid residue at this point would be in the form of heparinic acid, and not as heparin, and then later, two steps later, going back to ₚH 8,0 and resuspending in solution, the sodium hydroxide thereby added would add the sodium anion to the heparinic acid. [R. 70–71.]

After stating that he was familiar with enzymes, Dr. Day testified:

A. * * * If I may illustrate, in the case of a hydrolysis, the case in point, the native heparin in the tissue, where the standard techniques of hydrolysis to be employed, that is acid, one runs the risk of damaging or causing much more reaction than the one key reaction desired. Enzymes are beautifully specific in their action. One can choose an enzyme to do one singe job. That is the main reason for using enzymes. They will do a job that a chemist otherwise would have great difficulty doing.

Q. But do they in this job that they do, create new chemical products?—A. Every time, yes. [R. 72.]

The process or treatment contemplated by the provisions of paragraph 34 of the Tariff Act of 1930 for drugs which are natural and uncompounded is one which "advances" an existing drug in value or condition. *Chemical Specialties Co., Inc.* v. *United States*, 34 Cust. Ct. 155, C.D. 1698, affirmed in *Same* v. *Same*, 43 C.C.P.A. (Customs) 93, C.A.D. 614. The merchandise there involved consisted of a substance known as 21-acetoxy pregnenolone, a steroid, which was classified under paragraph 5 of the Tariff Act of 1930 as a medicinal preparation, with a duty assessment at the rate of 25 per centum ad valorem. Plaintiff-appellant claimed the merchandise properly dutiable at the rate of 5 per centum ad valorem under paragraph 34 of the act, as modified, as a drug, advanced, either directly or by virtue of the similitude provision of paragraph 1559 of the act.

Plaintiff, in the case at bar, maintains (brief, page 14) that "There is nothing in Paragraph 1669 ('crude' drug) which prohibits the phenomenon of isolation by a chemical reaction." In the *Chemical Specialties Co.* case, *supra*, our appellate court, page 98, stated:

It is also urged by appellant that the 21-acetoxy pregnenolone meets the meaning of the term "advanced" as it is used in the statute because "the advancement contemplated by the statute is an elaborate advancement." It also appears from appellant's brief that it is contended that "advanced" includes chemical reactions. There seem to be no pertinent cases which have specifically defined the term "advanced" as it appears in paragraph 34, *supra*. It is to be noted that paragraph 34, *supra*, recites "* * * advanced in value or condition by shredding, grinding, chipping, crushing, or any other processes or treatment whatever * * *." However, it appears that this portion of the statute has been judicially construed to include, in addition to the enumerated processes, the extraction of a drug with solvents, *Sherka Chemical Co., Inc.* v. *United States*, 33 C.C.P.A. (Customs) 53, C.A.D. 316, and concentration of a drug, *Roche-Organon, Inc.* v. *United States*, 35 C.C.P.A. (Customs) 99, C.A.D. 378. However, we know of no case which has gone so far as to include chemical changes within the meaning of the above-quoted phrase, and we are of the opinion that the chemical change involved in the present case is not included in the meaning of "advanced" as it appears in paragraph 34, *supra*.

The defendant, in the *Chemical Specialties Co.* case (C.D. 1698), *supra*, contended that the material there imported was not a "drug," advanced, as contemplated by paragraph 34, *supra*, under which plaintiff therein claimed, because the yam or root, cabeza de negra, from which the merchandise in question was obtained, never existed as a "crude" drug; that "the root would still have to have therapeutic or medicinal property to be a crude drug"; and that, in the production of the imported 21-acetoxy pregnenolone, an entirely different product is obtained, which has therapeutic and medicinal properties, "but only as the result of certain processes to which the original product is subjected." In this connection, our appellate court, in the *Chemical Specialties* case, *supra*, discussing the applicability of paragraph 34 of the tariff act to imported products, at page 98, stated:

Cases involving the question of whether a substance should be classified under paragraph 34, *supra*, rather than paragraph 5, *supra*, have been before us previously. There is one idea present in these cases, namely, that a basic criterion for an imported substance to be classified under paragraph 34, *supra*, is that it must have existed as such in the source from which it was obtained regardless of the manner in which it was extracted. See *Roche-Organon, Inc.* v. *United States, supra*, and *Sherka Chemical Co., Inc.* v. *United States, supra*. This criterion is not satisfied in the present case.

This court, in the *Chemical Specialties Co.* case (C.D. 1698), *supra*, page 160, stated:

The imported material in the case at bar, 21-acetoxy pregnenolone, is not a "natural" drug within the contemplation of paragraph 34, *supra*, of the tariff act. The processes indicated in the production of the imported merchandise

show that it is manufactured by a series of chemical reactions wherein *new* chemical compounds and intermediates are formed. This material in its condition, as imported, is itself a new and different compound from that of any of its predecessor combinations and is unlike the advanced drugs named in the pertinent paragraph. [Italics ours.]

We are of opinion that the reasoning applied by our appellate court, in the *Chemical Specialties Co.* case, *supra*, is equally applicable in the case at bar as it affects the situation before us. Here, as in that case, the starting material as it exists in nature, that is, the heparin in combination with the proteinaceous material, does not have therapeutic properties. Plaintiff's witness, Dr. Lewin, testified to the effect that the heparin, as found in combination with the proteinaceous material, had no therapeutic or physiological properties until separated (R. 52). This factor, in our opinion, establishes that the heparin in combination is not a "drug," within the contemplation of the tariff act and, thus, not a "crude" drug. Here, something more than a mere isolation process is involved. The record, in our opinion, establishes that, in the production of the involved substance from the basic material, an entirely different product is obtained, which has therapeutic properties "but only as the result of certain processes to which the original product is subjected." (*Chemical Specialties Co.* case (C.D. 1698), *supra*.) Accordingly, the processes employed to bring about the imported commodity do not constitute an "advancement" of a crude drug. Dr. Lewin confirmed that the hydrolysis process was a chemical change (R. 54) and that it is necessary to subject the heparin as it occurs in the tissue to a hydrolysis to get out the heparin portion (R. 55–56). Further, the Government's witness, Dr. Day, testified that chemical substances are created in the proteolytic digestion process (R. 67); that the lowering of the $_p$H content in the process "definitely hydrolyzes some peptide linkages" (R. 70); and that hydrolysis by the use of an enzyme creates new chemical products (R. 72). The aforesaid testimony, in our opinion, indicates, as heretofore noted, that the heparin obtained after separation from the proteinaceous matter is not a crude drug nor a drug, advanced, but that it is a new product, differing from that from which it was derived when in combination, and that such new product has the desired therapeutic properties to render it fit for use as a medicinal preparation.

Although there is testimony in the record to the effect that additional steps are necessary after importation to render the derived heparin suitable for medication, it does not appear, in our opinion, that such procedures essentially changed the nature of the importation at bar. In this connection, plaintiff's witness Palmaccio agreed, as heretofore disclosed, that it is "good practice to subject all drugs to rigid control, all medicinal preparations to a rigid program of con-

trol" (R. 63), which indicates, in view of the record, in our opinion, that the heparin obtained after separation was a medicinal preparation, fit for use as such, and requiring only certain refinements to render it appropriate for ultimate use.

Plaintiff, in its brief, directs our attention to the holding of the court in *Roche-Organon, Inc.* v. *United States*, 35 C.C.P.A. (Customs) 99, C.A.D. 378. In that case, our appellate court, invoking the rule of relative specificity, held that a certain substance invoiced as "Urine Concentrate in form of R III-crystals," used in the treatment of female disorders, was more specifically provided for as a "drug" under paragraph 34 of the tariff act than as a "medicinal preparation" under paragraph 5 of the act. In its decision, the court, in speaking of the imported commodity, stated, page 116:

> \* \* \* It is of animal origin; is natural and uncompounded, is not edible, is advanced in condition; has therapeutic or medicinal properties; is chiefly used for medicinal purposes, and contains no alcohol. \* \* \*

The holding of the court in the *Roche-Organon* case, *supra*, was predicated upon the above-quoted characteristics or elements which the court found the commodity there in question to possess. However, the same set of pertinent facts as appeared in the *Roche-Organon* case, *supra*, are not, in our opinion, present in the case at bar. Here, the starting materials did not have therapeutic properties for the indicated ultimate use and, accordingly, the heparin in combination was not a "crude" drug in the first instance and, as heretofore observed, the heparin extracted was not "advanced" from a crude state, thus warranting, in our opinion, a conclusion here different from that of our appellate court in the *Roche-Organon* case, *supra*.

Upon the record presented and for the reasons stated aforesaid, we hold the involved merchandise properly dutiable under paragraph 5 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 12½ per centum ad valorem as a medicinal preparation, not specially provided for, as assessed. The protests herein are overruled.