**SANDOZ, INC.**

**v.**

**UNITED STATES.**

**C.D. 3482; Protest No. 65/23109–19407–63.**

United States Customs Court,
First Division.

June 19, 1968.

Sharretts, Paley, Carter & Blauvelt, New York City (Howard C. Carter and Eugene F. Blauvelt, New York City, of counsel) for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Arthur H. Steinberg, New York City, trial attorney), for defendant.

Before WATSON and MALETZ, Judges.

WATSON, Judge:

The protest in this case involves certain merchandise described on the invoice as "Digitoxin USP XVI", which was assessed with duty at the rate of $11\frac{1}{2}$ per centum ad valorem under paragraph 5 of the Tariff Act of 1930, as modified by the Presidential proclamation to give effect to certain trade concessions resulting from the 1960–1961 General Agreement on Tariffs and Trade negotiations, T.D. 55615 and T.D. 55649, as a medicinal preparation.

Plaintiff claims the merchandise is properly dutiable at the rate of 4 per centum ad valorem under paragraph 34 of the Tariff Act of 1930, as modified by Presidential proclamation giving effect to certain agreements supplementary to the General Agreement on Tariffs and Trade, T.D. 55816, as a natural and uncompounded drug of vegetable origin, advanced in value or condition, having therapeutic and medicinal properties and chiefly used for medicinal purposes.

The statutes herein involved are as follows:

Paragraph 5, as modified by T.D. 55615 and T.D. 55649 provides in part:

Medicinal preparations (except any article otherwise provided for in this item and any article provided for otherwise than as a "medicinal preparation" in any item 5 or item 5 and 23 of Part I of any previous Schedule XX of the General Agreement on Tariffs and Trade) . . 11½% ad val.

Paragraph 34, as modified by T.D. 55816, provides:

Drugs such as barks, beans, berries buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin (except fish oils and fishliver oils); any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol . . . . 4% ad val.

It was stipulated between counsel at the trial that:

1. Digitoxin U.S.P. XVI is of vegetable origin.

2. Digitoxin U.S.P. XVI has therapeutic or medicinal properties.

3. Digitoxin U.S.P. XVI does not contain alcohol; and

4. Digitoxin U.S.P. XVI is not edible.

The record in the case at bar consists of the testimony of two witnesses called by the plaintiff and one witness who testified on behalf of the defendant. In addition, there were introduced in evidence a number of exhibits, which will be hereinafter discussed as the determination of the issues in this case requires.

Plaintiff called as the first witness, Dr. Emil Angliker, a chemist since 1947 and head of the glycosides manufacturing department of Sandoz, Ltd., in Basle, Switzerland. Dr. Angliker is a doctor of natural science, having received his degree from the Swiss Federal Institute of Technology in Zurich, and is a member of the Swiss Chemical Society. The record further discloses that plaintiff's witness has participated in the preparation of the technical publications shown on plaintiff's exhibit 1. (R. 5.) He also holds a number of patents in different countries including the United States.

Plaintiff's second witness was Dr. Shih C. Wang, professor of pharmacology at Columbia Presbyterian Medical Center, New York. He received an M.D. degree in 1935 from Peking Union Medical College, and the degree of Ph.D., Doctor of Philosophy, from Northwestern University Medical School, Chicago, Illinois.

Defendant called as its witness, Dr. James J. Chap, chief of the organic division (including drugs), United States Customs Laboratory at the port of New York. The record discloses that he has had, in addition, some 30 years of experience as a practicing chemist with various Government Agencies, such as the Division of Laboratories, Washington, D. C.; United States Army, Special Engineers Corps, Los Alamos, New Mexico; United States Food and Drug Administration. Dr. Chap also holds A.B., M.S., and Ph.D. degrees in Chemistry.

Dr. Angliker, who it appears is an exceptionally well-qualified witness, tes-

tified that in order to extract the digitoxin, the plants are specially bred, then the leaves are harvested, dried carefully, and powdered. They are then placed in water, allowed to stand, and then the water extract is separated from the residue. The extract, a water solution of glycosides, is purified by shaking with solvents to remove impurities. The purified glycosides are extracted from the solution with chloroform or another commercial solvent, "and so we get the crude glycosides fraction, the crude digitoxin." Where a good strain of digitoxin leaves are used, digitoxin is crystallized directly from the solution, but normally the separation of the digitoxin from other glycosides is accomplished by chromatography and "so we get the pure fractions of digitoxin." This fraction is then crystallized and the final product is thus obtained. (R. 7–8.) He stated that when the powdered substance is in the water solution, enzymatic reactions take place; that in digitalis lanata there is a glucose and acetyl group and that, in this case, both groups are split off by enzymatic reaction. (R. 10.) No acid or alkali is added during the process of isolating digitoxin. (R. 95.)

Plaintiff's witness further testified that an example of crystallization is the appearance of salt crystals when sea water is allowed to evaporate (R. 13) and that this is a physical rather than a chemical means of separation; that the use of solvents is also a physical rather than chemical process because the solvents do not chemically combine or react with the digitoxin. Dr. Angliker explained that chromatography is accomplished by packing a tube with an inert material, that the "crude" digitoxin and a solvent such as chloroform or a mixture of chloroform and methanol is introduced at the top of the tube and the glycosides pass through the column at different speeds separating the digitoxin from the related glycosides, gitoxin and diginatin, and that this too is a physical rather than a chemical means of separation. (R. 14–16.)

Plaintiff's second witness, Dr. Shih C. Wang, testified that he was familiar with digitoxin, having used digitalis products for some 5 or 6 years, and described it as "one of the most potent glycosides extracted from digitalis leaves." (R. 97.) He classified digitoxin as "a natural product extracted from crude drugs." (R. 98.) On cross-examination, the witness stated that his testimony on direct examination that he classified the digitoxin as a "natural" product, meant that it is of vegetable origin. (R. 110.)

Paragraph 34 of the Tariff Act of 1930, as modified, provides *inter-alia* that a drug to be classifiable thereunder must be "natural", "uncompounded", and "advanced". In our opinion, the product under consideration, in its imported condition, is not embraced by any of these required elements so as to be properly classifiable under the claimed provisions of paragraph 34 of the tariff act. The record herein discloses that, in the case of digitalis lanata, the starting material is "lanatoside A", from which the acetyl and glucose components are split off in obtaining the imported product, digitoxin. Plaintiff's witness, Dr. Angliker, testified that when the glucose and acetyl groups are split off from "lanatoside A", you would have digitoxin but no longer "lanatoside A". When the "lanatoside A" breaks down, the glucose is split off and you then have acetyl digitoxin. (R. 46.) When the acetyl group is split off, you get acetic acid. (R. 47.) The record further discloses the following testimony of plaintiff's witness:

MR. STEINBERG:

Q. In these enzymatic reactions, isn't it true that you have chemical changes?—A. Yes. Here in this case, you see we get digitoxin. [R. 53.]

It further appears that in the process of enzymatic hydrolysis, hydrogen is added to digitoxin. Plaintiff's witness agreed that in the process digitoxin takes on an additional hydrogen atom in the digitoxose group of the digitoxin molecule. (R. 66.) Defendant's exhibit G was stated by plaintiff's witness as representing "the building of the digitoxin from lanatoside A by enzymatic reactions."

(R. 67.) The witness further testified that "the combining of the *water* with the lanatoside A in the presence of this enzyme" is what he referred to as hydrolysis. (R. 68). [Italics ours.] Thus, it would appear that the end product is not caused by the presence of the enzymes alone, but that the lanatoside A is artificially changed so that digitoxin in pure form is produced. Thus, a significant factor, in our opinion, in concluding that the imported product is not an "uncompounded" drug, as claimed, is that the digitoxin as appears from the record, is induced by chemical changes. Dr. Angliker admitted that there are chemical changes involved in converting lanatoside A into digitoxin. (R. 52, 53.) Confirmation of the fact that the chemical formula of digitoxin is different from the chemical formula of lanatoside A is indicated in defendant's exhibit G, and by the testimony of plaintiff's witness. (R. 75.) It would thus appear that the production of digitoxin is dependent upon a chemical reaction, a factor, which, in our opinion precludes the imported product from being classified as an "uncompounded" drug. Further, the record discloses, in our opinion, that in the process here employed to obtain the digitoxin, its precursor in digitalis lanata, namely, lanatoside A, is destroyed as a distinct chemical entity, by splitting off the glucose and acetyl components, and that in the process a new substance is produced. Accordingly, since the imported merchandise was produced from a precursor in the plant material through chemical reactions which were artificially induced and since the precursor itself was destroyed in the process and a new and distinct chemical entity, digitoxin, was produced, the merchandise here involved is not "uncompounded," in our opinion, within the meaning of paragraph 34 of the tariff act.

For many of the above reasons stated, we are of opinion that digitoxin is neither a "natural" drug nor an "advanced" drug within the purview of paragraph 34 of the tariff act. The record in the case at bar discloses that in the process of producing digitoxin from digitalis lanata, the molecular structure of lanatoside A, the precursor of digitoxin in digitalis leaves, is changed. Plaintiff's witness, Dr. Angliker, admitted that after the acetyl and glucose groups are split off, the molecule is digitoxin and there is no longer any lanatoside A. (R. 39). The chemical changes here employed to produce commercially useful quantities of digitoxin, are not, in our opinion, caused by natural reactions of the plant material itself, and the imported digitoxin which is artificially produced is not "natural" as required by the provisions of paragraph 34. Here, the production of digitoxin U.S.P. XVI is simply more than a matter of nature taking its course.

The record in this case clearly discloses, in our opinion, that digitoxin is a distinct chemical entity and drug from its precursor in the digitalis leaves, lanatoside A. This conclusion is supported by the various steps employed in the production of the end product. The chemical conversion of the lanatoside A into digitoxin is not a mere extraction or concentration of the preexisting digitoxin and is not an "advancement" of the drug under the relevant statute.

Plaintiff in the case at bar directs our attention to the holding of this and our appellate court in a number of cases wherein the question to be resolved was whether a certain product was a "crude" drug or one "advanced" in value or condition within the contemplation of the relevant tariff acts. The facts in the case before us, however, are distinguishable, in our opinion, from those in the cases cited by the plaintiff. In the latter cases, no chemical changes were involved in the process of obtaining the drugs from their natural sources. The situation in the case before us would be analogous to that in the cases relied upon by the plaintiff herein if the imported merchandise were "lanatoside A", which is the naturally occurring glycoside of digitalis lanata. The record herein discloses, however, that digitoxin is a distinct chemical entity and drug from its precursor in the digitalis leaves. As hereto-

fore noted, plaintiff's witness, Dr. Angliker, admitted on cross-examination that only a "small quantity" of digitoxin is found in the growing leaf and that a commercially useful quantity of digitoxin is obtained by the methods outlined by plaintiff's witness. (R. 80.) It would appear from the record, therefore, that to obtain commercially useful quantities of digitoxin it was necessary, as was done in this case, to chemically change the precursor in the leaves, lanatoside A, into the desired product, digitoxin.

As heretofore indicated, the Government called as its witness, Dr. James J. Chap, chief of the organic division, United States Customs Laboratory, New York City. Upon being shown the formula as represented in defendant's exhibit G, Dr. Chap was asked his opinion as to "whether this shows a chemical reaction in which lanatoside A, plus water, plus the enzyme, is converted into digitoxin, acetic acid, and glucose?" (R. 116–117.) In this connection, the record discloses the following:

A. I have an opinion that it is a chemical reaction.

Q. Will you state your opinion?— A. The reaction as shown here is a hydrolysis reaction which although it requires an enzyme in this case, in my opinion it is still a chemical reaction; that the enzyme, which is a large proteinase molecule, whether it acts physically, or subsurface effect, the water, in my opinion, doesn't come from the enzyme, but comes from the water in the surrounding substrate to convert lanatoside A into digitoxin, acetic acid, and glucose.

JUDGE WATSON: Would your testimony be the same if the molecular enzyme, the enzyme were not present, would that normally still be the same?

THE WITNESS: Yes.

JUDGE WATSON: Is it possible to extract any enzyme and get a purely chemical reaction? Would they be in the same form as they are now?

THE WITNESS: Yes, in my opinion.

BY MR. STEINBERG:

Q. Did you mean if the enzyme weren't there, if there were something else there to substitute for the enzyme?

JUDGE WILSON: Let him tell us what he meant.

THE WITNESS: In hydrolytic reactions, there is an equilibrium set up. I am sure there would be some equilibrium shown. The reaction shown in one direction could go back the other way, and I am sure these products, whether it goes completely to the right, the enzyme is necessary in this case, but if there was no enzyme present, the reaction still would take place, there would be hydrolysis. The water would still form ions, and act upon the lanatoside A.

The testimony referred to above indicates that, while the enzyme is necessary in this case, it is only one of several factors relied upon by the manufacturer to produce digitoxin, and that, notwithstanding the part which enzymes may play as a catalyst, the imported digitoxin is, nevertheless, artificially produced and is not merely an end product of the natural processes of the plant.

Both parties to this controversy direct our attention to the holding of the court in Chemical Specialties Co., Inc. v. United States, 34 Cust.Ct. 155, C.D. 1698, affirmed in Chemical Specialties Co., Inc. v. United States, 43 CCPA 93, C.A.D. 614. There, a substance known as 21-acetoxy pregnenolone, a manufactured chemical product, having therapeutic and medicinal properties and chiefly used for medicinal purposes, was held properly dutiable under paragraph 5 of the Tariff Act of 1930, as a medicinal preparation, as assessed, rather than as a drug, advanced, under paragraph 34 of said act, as claimed. It was stipulated therein by counsel that the imported 21-acetoxy pregnenolone was produced by a series of chemical steps from a yam commonly known as the "cabeza de negra", and that these steps culminated in the production of 21-hydroxy pregnenolone. It was fur-

ther stipulated that the 21-hydroxy pregnenolone was acetylated with acetic anhydride thus forming 21-acetoxy pregnenolone. Plaintiff's witness, a director of research in physiology and biochemistry, testified therein that he had found infinitesimal traces of a substance known as 21-hydroxy pregnenolone in human blood, taken from a blood bank and also in human urine, and in synovial fluid, i. e., the fluid taken from the knee joint of a patient. Plaintiff's witness further testified that the imported 21-acetoxy was a form of 21-hydroxy pregnenolone, "a further processing of the first drug," advanced over the 21-hydroxy pregnenolone. Plaintiff, on its part, did not maintain that the imported material, 21-acetoxy pregnenolone, as such, was found in the powdered yam but contended that "the steroid nucleus is there," which is common to all steroid hormones and that the imported merchandise "is an advanced form of what is in the steroid nucleus." (C.D.1698).

This court in the *Chemical Specialties* case (C.D.1698), supra, in its decision, at page 160, stated:

The imported material in the case at bar, 21-acetoxy pregnenolone, is not a "natural" drug within the contemplation of paragraph 34, supra, of the tariff act. The processes indicated in the production of the imported merchandise show that it is manufactured by a series of chemical reactions wherein new chemical compounds and intermediates are formed. This material in its condition, as imported, is itself a new and different compound from that of any of its predecessor combinations and is unlike the advanced drugs named in the pertinent paragraph.

at page 161:

The process or treatment contemplated by paragraph 34 of the tariff act so as to bring a crude drug (paragraph 1669) within its provisions is one which advances an existing drug in value or condition. In the process

of synthesizing, heretofore described, however, the source material, the cabeza de negra, is completely destroyed and its identity lost. The product here imported is not an advancement of its predecessor material but is itself a distinct chemical entity.

and at page 162:

Merchandise is classifiable in the condition in which imported. United States v. Yardley & Co., Ltd., 16 Ct. Cust.Appls. 499, T.D. 43226. The merchandise with which we are here concerned is 21-acetoxy pregnenolone, not 21-hydroxy pregnenolone. No proof has been adduced establishing that 21-acetoxy pregnenolone is found in nature, and the record is indisputable that the imported merchandise is a manufactured product. The preponderance of the evidence in this case supports the collector's presumptively correct classification.

Our appellate court in the *Chemical Specialties* case (C.A.D. 614), supra, affirmed the holding of this court that the imported 21-acetoxy pregnenolone was not a "natural" drug but was a product which had been artificially produced and unlike the drugs provided for in the claimed paragraph 34 of the tariff act. The court further held that the product under consideration was not an "uncompounded" drug, nor was it an "advanced" drug within the meaning of the statute.

In our opinion, the holding of the court in the *Chemical Specialties* case (C.A.D. 614), supra, is controlling in the case at bar. Here, as in the case above cited, the imported product "is not an advancement of its predecessor material but is itself a distinct chemical entity."

Upon the record in this case, and for the reasons stated, we are of opinion and hold that the imported digitoxin U.S.P. XVI is not a "natural" and "uncompounded" drug, advanced in value or condition as contemplated under the provisions of paragraph 34 of the Tariff Act of 1930, as modified. It is properly classifiable under paragraph 5 of said act, as modi-

fied, at the rate of 11½ per centum ad valorem as a medicinal preparation.

The protest in this case is overruled. Judgment will issue accordingly.

MALETZ, Judge, concurs.