(C. D. 871)

JUDSON SHELDON CORPORATION v. UNITED STATES

United States Customs Court, First Division

(Decided August 16, 1944)

*Eugene R. Pickrell* (*Eugene A. Chase* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: *Wilson & Co., Inc.*, meat packers of Chicago, Ill., imported in November 1941 from Sao Paulo, Brazil, a commodity invoiced as "Beef Liver Extract" which was entered at the port of New York. The merchandise was classified as a drug, advanced in value or condition, under paragraph 34 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 34), and was assessed with duty at 10 per centum ad valorem. The protest claims the product to be a crude drug and therefore entitled to free entry under paragraph 1669 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1669).

All facts essential to the collector's classification are presumed to have been established, *United States* v. *R. Hillier's Son Co., Inc.*, 16 Ct. Cust. Appls. 103, T. D. 42762. The statutory definition of a drug, paragraphs 34 and 1669, *supra*, a substance "having therapeutic or medicinal properties and chiefly used for medicinal purposes," is applicable to the merchandise now before us. Hence, the issue is limited to the question whether, within the purview of the paragraphs in question, the imported drug is in a crude state, as claimed, or has been processed to an advanced condition, as assessed.

The importer's general manager, David Klein, a qualified biochem-

ist, was the sole witness. Prior to his present position, he was associated with Wilson Laboratories, formerly a separate organization affiliated with Wilson & Co., Inc., but now an integral part of the corporate entity. His experience therewith, which included "the development of medicinal products derived from glands of animals that have therapeutic value" gives his testimony the probative value with which it is accepted. Following employment as director of research, he assumed entire charge in 1926 of "production sales, development, and all of the activities connected with the manufacturing pharmaceutical business." Part of his duties required the issuance of directions to the foreign exporter for preparing the imported commodity, and, after receipt of the merchandise, to determine by test if the product met specifications. From the appearance, odor, and taste of the product in question, exhibit 1, he was able to identify it as the same as material which he has produced in large quantities for his employer. To obtain the imported commodity, beef livers are ground for the purpose of obtaining the best liquid extract from the soluble portion; water is added and the material is subjected to heat "between 170 and 180 degrees Fahrenheit for 30 minutes"; the boiling mass is then strained, which is largely a separating process, isolating the liquid from the coagulated portion; further washing with water of the solid or meat portion removes additional soluble quantity, which is combined with the original amount of water extract; this material, approximately 2 per centum solids, contains the desired therapeutic properties inherent to beef liver; to render the merchandise suitable for shipment, it is "concentrated in a vacuum to a solids content of between 55 and 60 per cent," and then placed in suitable containers that are maintained throughout the entire period of shipment at a temperature of "about 40 degrees Fahrenheit"; the protein material and valuable vitamins associated with the insoluble or fat portion of the beef livers are retained in Brazil as food for both humans and animals.

After the merchandise is received in the importer's laboratory, it is subjected to a predigesting process, converting it into assimilable forms "so that the sick person, the invalid, the convalescent who would use that material would have no further work to do than just to take it and absorb it." Following such treatment, the product is sent to a pharmaceutical establishment where it is combined with other ingredients into a preparation, prescribed by doctors, "for the treatment of anemia, malnutrition after convalescence and any condition that the physician considers require liver and iron therapy."

The processing after importation is not set forth in detail because such manipulation is immaterial for the purposes of the present case. We are concerned only with the operations in the country of exportation, whether the treatment there advanced the imported drug beyond

a crude state, the test being that the merchandise is "not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture" (paragraph 1669, *supra*).

The Secretary of Agriculture pursuant to statutory authority, section 306 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1306) and the Federal Food and Drugs Act of 1906 (21 U. S. C. 1940 ed. § 111) issued the following rules and regulations relating to importation of meats, all having a direct and important bearing upon the issue here: Amended part 94, chapter I, title 9 of the Code of Federal Regulations (exhibit 2), prescribe that "contagious and communicable disease of rinderpest or of foot-and-mouth disease" (sec. 94.1) exist in Brazil, and therefore the importation of "fresh, chilled, or frozen organs, glands, extracts, or secretions derived from domestic ruminants or swine" (sec. 94.3) originating in said country is prohibited, "except for pharmaceutical purposes," and then only, part 95, regulation 17, sec. 95.17 (b) of said code (exhibit 3) "if accompanied by the certificate of a consular officer showing that in process of preparation the particular product was subjected to a temperature of not less than 156° F. (68.9° C.)." It is conceded that the foregoing regulations, possessing the force of law, apply to the imported product here.

The witness testified that such an undertaking could not be made with these beef livers because you cannot heat the whole livers to any such temperature with safety, and even if they were heated to that temperature they would have to come in under freezing conditions and the importation of frozen livers is wholly impractical because of the necessity to keep them, throughout the entire period of shipment, below freezing, probably a temperature of 10° or 12° F. below freezing, in order to keep them in a sound condition, whereas this material (exhibit 1) can come in at a temperature of 40° F., that is, above freezing (p. 12). Further testimony revealed that procurement of satisfactory and adequate storage space presents a major difficulty in the shipment of Brazilian beef livers. Not only are the facilities required practically inaccessible but the space for the livers would be at least 15 times the space for the liver extract, because it takes 15 pounds of livers to make the extractives for 1 pound of this material. The hardships encountered in trying to ship whole livers would also be presented if importation of the chopped livers were attempted. To dry the livers would destroy certain of the valuable constituents required in the medicinal use of the finished product. Importation of the liquid extract, without concentration, is also highly objectionable. This would result in shipment of large amounts of cakes of ice to this country and the volume there would be even larger than the volume of the original livers. The product

in question, as it arrived in this country, is the crudest form in which the desired therapeutic properties of liver could be imported. The commodity is uncompounded and inedible, having very little food value. Some of the foregoing observations have little, if any, controlling influence upon our attitude here, for there is no testimony to the effect that certain of the inconveniences could not have been overcome.

*F. W. Myers & Co., Inc.* v. *United States*, 29 C. C. P. A. 30, C. A. D. 167, involved circumstances from which an analogy can be drawn to those outlined above. There, the merchandise consisted of frozen beef livers from Canada, for use in the manufacture of liver products prescribed for "the treatment of pernicious anemia and products containing vitamins, some of which are obtained from liver." The consumption entry bore a notation that the merchandise was "inedible and unfit for human consumption (for medicinal purposes only)," and was accompanied with a duly executed certificate from the Canadian Department of Agriculture attesting that the shipment consisted of "carcasses, portions, or products which are inedible and unfit for food." The effect of such disclosures was to obtain admission of the merchandise into this country without inspection by the Bureau of Animal Industry of the United States Department of Agriculture, and based upon this exemption from department regulations tariff classification as a drug was sought, the importer claiming "that the sale or use of it as food would have been in violation of law and that therefore the frozen beef livers were not edible and that they were crude drugs." In giving no merit to this theory, the court said:

> There is nothing in the record which even by inference can sustain the contention of appellant that the imported merchandise is an inedible drug. On the contrary, the evidence clearly shows that the imported beef livers are edible, even though it was necessary to comply with certain formalities if they were exported as food. The fact that the exporter did not seek to follow the necessary routine mentioned with respect to the certification of products intended for food purposes does not, of itself, render the goods any the less edible.

In the instant case, it may be said that merely because the importer did not seek to follow mandatory regulations concerning shipment of beef livers from Brazil, difficult as compliance with such requirements would be, does not establish as a matter of fact, that the necessary shipping conditions could not be complied with. The distinction between regulations controlling the present situation and those applicable in prior litigation is the requirement to heat the beef livers "to a temperature of not less than 156° F. (68.9° C.)," which results in their destruction. So far as we have been able to determine, no like or similar condition was presented in previous adjudications by the courts.

The *Myers* case, *supra*, is cited by plaintiff to support the contention that beef livers are edible and therefore are not drugs, such

argument being used for the presentation that the present merchandise is a crude drug and the processing after importation developed an advanced drug ultimately used in a medicinal preparation. In the cited case, however, the court found that the imported Canadian livers were the same as beef livers used as meat food in this country. The same is not true of Brazilian beef livers, from which the commodity in question is derived. As hereinabove set forth, beef livers from Brazil may be imported only for pharmaceutical purposes. In the light of this essential difference between the two kinds of imported beef livers, the suggestion of plaintiff is without force or effect toward a proper determination of the present issue.

Plaintiff's undisputed testimony is decisive of the question before us, being sufficiently effective to find that the imported product is the only feasible form in which the desired therapeutic properties of Brazilian beef livers can be obtained. As stated by the witness, "It is a crude, unfractionated water extract in a concentrated form of beef livers. It is the simplest product that can be made from the liver." There is no contradiction of the statements that the livers, either whole or chopped, cannot be imported with safety, and that the storage and transportation problems are so difficult as to render entirely impractical shipment of such livers. No attempt was made by defendant to refute any of the witness' opinions. They are before us as established facts, sufficient for the conclusion that the processing in Brazil was essential to prevent decay or deterioration pending manufacture, and that such treatment did not advance the imported drug beyond a crude state. We therefore hold the merchandise in question to be a crude drug, as contemplated by paragraph 1669, *supra*, and entitled to free entry thereunder, as claimed. *Vandegrift & Co.* v. *United States*, 13 Ct. Cust. Appls. 30; T. D. 40865.

The vital distinction between our recent decision in *Geo. S. Bush & Co., Inc.* v. *United States*, 10 Cust. Ct. 313, C. D. 773 (affirmed in *same* v. *same*, 32 C. C. P. A. 56, C. A. D. 285, decided June 19, 1944), and the present case lies in the reason for processing the livers in the country of exportation. In the *Bush* case, the dogfish livers were destroyed in the series of operations that produced the imported oil as a therapeutic agent. There was not the slightest suggestion in that case concerning the necessity for processing the raw livers for preservation or transportation purposes from Canada, the place of shipment.

The *Hillier* case, *supra*, cited by defendant, presented an entirely different factual basis from that before us, and therefore is not in point. In that case, it was established of record that the quillai bark, from which the imported siftings were cut, has been imported, on previous occasions, and processed here. Then, too, no claim was made there that the crude Chilean bark cannot be imported

without injury or inconvenience in its original condition. There, the imported product was held classifiable, and properly so, as an advanced drug.

The protest is sustained and judgment will be rendered accordingly.