(C. D. 1667)

FREDERICK STEARNS & COMPANY
FREDERICK STEARNS & COMPANY
   DIVISION OF STERLING DRUG,
   INC., SUCCESSOR
} v. UNITED STATES

## United States Customs Court, First Division

(Decided December 29, 1954)

*Eugene A. Chase* for the plaintiff.
*Warren E. Burger*, Assistant Attorney General (*Joseph E. Weil, Arthur R. Martoccia*, and *Richard M. Kozinn*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise here in question consists of beef liver extract imported from Argentina. Part of said importation was invoiced as "Higado Concentrado 1: 20 en Polvo," or beef liver concentrate in powder form, was classified under paragraph 5 of the Tariff Act of 1930, as modified by the trade agreement with Argentina, T. D. 50504, as a medicinal preparation of animal origin, not specially provided for, and was, accordingly, assessed with duty at the rate of 12½ per centum ad valorem. Plaintiff claims this liver extract in powder form to be properly classifiable under paragraph 34 of the tariff act as a drug of animal origin, advanced in value or condition, and dutiable thereunder at the rate of 10 per centum ad valorem.

Certain other commodities involved herein, which were invoiced as "Higado Concentrado 1: 20 en Pasta," or liver concentrate in paste form, as well as merchandise invoiced as "Extracto de Higado 1:125," or extract of liver, were classified under paragraph 34 of the Tariff Act of 1930 as drugs of animal origin, advanced in value or condition, subject to duty at the rate of 10 per centum ad valorem.

Plaintiff claims the involved liver concentrate in paste form (Higado Concentrado 1: 20 en Pasta), as well as the extract of liver (Extracto de Higado 1:125), to be properly free of duty under paragraph 1669 of the act as crude drugs of animal origin, not advanced in value or condition by any process or treatment whatever beyond that essential to their proper packing and the prevention of decay or deterioration pending manufacture.

The pertinent parts of the statutes in question are as follows:
Paragraph 5, Tariff Act of 1930, as modified by T. D. 50504:

All medicinal preparations of animal origin, not specially provided for, 12½% ad valorem.

Paragraph 34, Tariff Act of 1930:

Drugs, such as barks, * * * and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible,

and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: * * *.

Paragraph 1669, Tariff Act of 1930:

Drugs such as barks, * * * and all other drugs of * * * animal origin; * * * which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition * * * .

The record consists, first, of the deposition taken, pursuant to a commission issued by this court, of Dr. Orsini Nicola, a pharmacist and chemist, who was the technical director of the producer of the imported merchandise in Argentina, and who was familiar with the method employed in its production (plaintiff's exhibit 1). There was also incorporated in the record of the case at bar the record in the case of *Frederick Stearns & Company, Frederick Stearns & Company Division of Sterling Drug, Inc., Successor* v. *United States*, 26 Cust. Ct. 360, Abstract 55240 (protest 140782–K). Two other witnesses testified at the trial—one on behalf of the plaintiff, and the other for the defendant.

Also received in evidence was a page from an advertising catalog, issued by the manufacturer of the imported merchandise and entitled "Quotations and Characteristics of Our Different Types of Liver Extracts," which list had been transmitted under date of September 28, 1945, by an employee of the plaintiff to a customs agent at the port of entry (defendant's exhibit A). Indicated on the list is a type of liver concentrate known as "1:20 Whipple fraction enriched." The collector's classification of part of the imported merchandise as a medicinal preparation was based on a determination that such merchandise was of the type indicated on the manufacturer's list as "1:20 Whipple fraction enriched."

In the incorporated case, plaintiff's witness Nicola, in response to direct interrogatories, testified that the beef liver extract there under consideration, described as "Higado Concentrado 1:20 en Polvo," was produced by the Cohn-Minot method which he described as follows:

That it consisted in the double aqueous acid extraction while hot (60°) of fresh triturated liver, heating to 85°, separation of fats, filtration, concentration to a clear extract and desiccation on rollers or in vacuum cabinets, producing an opotherapeutic product of total extraction, of the type industrially called "crude." [Q. 17.]

The witness further testified that, "as far as he knows," such beef liver extract did not contain anything which was not naturally present in the beef livers used in its preparation (Q. 18) and that the components of the beef liver extract were entirely the natural components of beef livers (Q. 20); that the processes or treatments to which the

beef livers were subjected were essential to the proper packing of the product and the prevention of decay or deterioration before its use (Q. 22).

On a cross-interrogatory, plaintiff's witness in the incorporated case, after again stating that the Cohn-Minot method was employed in the production of the powdered beef liver extract there involved, was asked:

X Q. 9. * * * please describe in detail each step of every process made by you in the production of beef liver extract.

In reply, he testified as follows:

A. That the liver of fresh cattle is triturated and macerated at 60° in water, acidified with sulphuric at a pH 5–6 during one hour, the maceration is percolated and extracted again with acid water. Both percolated acid macerations are mixed and heated at 85° during half an hour, the fats are decanted and it is filtered through a press-filter. The limpid solution is concentrated in vacuum evaporators at 60° to the consistency of clear extract. Said extract is desiccated on rollers or vacuum cabinets and finally pulverized (type: total extract, crude). When the solution is percolated, Whipple fraction *can* be added, liver peptone prepared extemporaneously, then it is heated at 85° (half an hour) and the former procedure is continued to finish the concentrate to a state of paste (clear extract) or powder (type: extract enriched with the Whipple fraction). Another process is the one that consists in separating the Cohn fraction from the Whipple one, by adding alcohol until a graduation of 70% is reached, for which the clear extract obtained in the first process is extracted with the alcohol in an adequate agitation apparatus. The decanted alcoholic liquids which come from two extractions, are filtered and concentrated at a low temperature and in vacuum to a clear extract (type: extract enriched with the Cohn fraction). The remaining insoluble fraction of the alcoholic extractions are subjected to the recovery of alcohol with which they are saturated and the extract obtained (concentrated) makes the crude Whipple fraction. For the preparation of injectable liquids, we start from the clear extract in which the Cohn fraction is predominant, for which it is again dissolved in 70% alcohol, an organic calcium salt is added until it does not precipitate and the decanted solution is put in the icebox during 12 to 24 hours, then is filtered. With the filtered liquid, two types of extracts can be obtained, one produced from the alcoholic evaporation (type: "crude") and the other, by pouring said solution in a quantity ten times of 96% alcohol with which is obtained a precipitate which is separated, washed with alcohol and either, then is dried in vacuum (type: purified). [Italics ours.]

Defendant in the present action maintains that the testimony of plaintiff's witness, Nicola, as disclosed in his answer to cross-interrogatory No. 9 in the incorporated case, above recited, together with the testimony in the present record, establishes that the powdered beef liver extract here involved was "enriched" with the so-called Whipple fraction, resulting in a compounded substance, and that, as such, the merchandise is precluded from classification as an advanced drug under paragraph 34 of the tariff act, which includes only such drugs as are uncompounded. We are of opinion, however, that the contention of the defendant in this respect is untenable.

An analysis of the "answer" to cross-interrogatory No. 9, as given by plaintiff's witness in the incorporated case, persuades us that it

was intended to cover all the processes employed in the production of all types of beef liver extracts which this witness had carried out, including that enriched with the Whipple fraction, and that it does not refer solely to the production of powdered beef liver extract, such as is here in question. This appears to be confirmed by the witness' answer to cross-interrogatory No. 13 in the incorporated case, wherein it was stated that the manufacturing process used to obtain the powdered liver concentrate there under consideration was "described in the first paragraph of Point 9." Reference to the description in the first portion of cross-interrogatory No. 9 shows that no mention is there made as to the employment or addition of the so-called Whipple fraction in the production of the product there imported. While the complete "answer" to cross-interrogatory No. 9 includes a statement that "When the solution is percolated, Whipple fraction *can* be added \* \* \* ," there is nothing in the present record to support a finding that the imported merchandise was prepared by the addition of Whipple fraction.

In the incorporated case, powdered beef liver extract assessed, as here, at 12½ per centum ad valorem as a medicinal preparation under paragraph 5 of the Tariff Act of 1930, was likewise claimed dutiable at 10 per centum ad valorem under paragraph 34 of the act as a drug, advanced in condition. The court found that the involved product was an "uncompounded, inedible substance, containing no alcohol \* \* \* and that the grinding of the liver into powdered form, producing the imported commodity, processed the substance beyond what was necessary to prevent deterioration, thereby removing the drug from a crude state and bringing it to an advanced condition." The court there held the merchandise properly classifiable as a drug, advanced, at the applicable rate under paragraph 34, *supra*, as claimed.

There is nothing in the present record which, in our opinion, calls for a conclusion different from that found in the incorporated case, and which would establish that the commodity here imported has been compounded. The testimony of plaintiff's witness, Nicola, in the present case, as indicated in his deposition, is to the effect that the powdered beef liver extract here under consideration (Higado Concentrado 1:20 en Polvo) was produced in the same manner as was the powdered beef·liver extract which was the subject of our decision in the incorporated case (direct interrogatory No. 25). This has not been controverted by any evidence on the part of the defendant.

The testimony adduced at the hearing in the present case likewise supports the position of the plaintiff and negatives a finding for the defendant. On behalf of the defendant, there was introduced the testimony of Charles E. Wyllie, United States customs agent in the Detroit area, who stated that on September 26, 1945, he interviewed Mr. O. P. Eyre, then manager of the Digestive Ferments Division

of the importing firm, relative to the importation of the liver concentrate 1:20 (Higado Concentrado en Polvo) here in question. Defendant's witness testified that he was informed by the said Mr. Eyre that the meaning of the term "1:20 Whipple fraction enriched," as it appeared on a list (defendant's exhibit A) of beef liver concentrate manufactured by the exporter of the involved powdered beef liver concentrate, was that "vitamins of a known potency that had been established by means of the Whipple method of assaying, had been added to the powder at the factory" (R. 20–21) to increase the vitamin content (R. 23). Plaintiff's witness Eyre testified in rebuttal, however, to the effect that, in his work as "manager of the sales division for digestive ferments," he had had nothing to do with the preparation of beef liver extract, 1:20 powder; that he had never seen merchandise of this type prepared and had no personal knowledge of its method of preparation (R. 24). He further stated that he did not know whether or not his company had purchased beef liver extract of the type shown on the exporter's catalog as being enriched with the Whipple fraction and that he did not know whether the 1:20 beef liver extract imported by his firm was 'or was not so enriched (R. 25–26). The witness further testified that his company did not purchase all the types of liver extract shown on the exporter's catalog and that, so far as he knew, plaintiff purchased other products not shown on said list, which he stated was not representative of all the purchases made by the plaintiff from the exporter herein (R. 28).

In the light of the above exposition, the most that can be said with respect to the purported statement of plaintiff's witness, Eyre, as to the meaning of the term "1:20 Whipple fraction enriched," in relation to beef liver extract, as it appears among the products listed in the exporter's catalog, is that it indicates that a type of beef liver extract enriched with the Whipple fraction was offered for sale. While such an addition might well result in a compounded product "which gives the material its essential characteristics" for its intended use (*cf. Birn & Wachenheim (United States Impleaded)* v. *Du Pont Cellophane Co. (Inc.)*, 17 C. C. P. A. 122, T. D. 43454), the testimony of the witness is far from establishing that the powdered beef liver extract here imported is of that type. A fair analysis of the record, in our opinion, indicates otherwise. Further, the lack of familiarity of plaintiff's witness Eyre with the production of the imported merchandise, specifically as to whether it was enriched with the Whipple fraction, precludes a conclusion that the imported product was so enriched.

We are of opinion that the record in this case is sufficient to establish that the imported powdered beef liver extract (Higado Concentrado 1:20 en Polvo) is a drug, advanced in value or condition, and that it has not been compounded. Accordingly, it is properly classifiable

under paragraph 34 of the tariff act as a drug advanced in condition, uncompounded.

Where, as in this case, the competition is between a medicinal preparation, as classified, and our finding here that it is a drug, advanced in value or condition, uncompounded, the imported product is more specifically classifiable as a drug. (*Roche Organon* v. *United States*, 35 C. C. P. A. (Customs) 99, C. A. D. 378.) Consequently, we hold the merchandise herein described as "Higado Concentrado 1:20 en Polvo," except that covered by entry No. 2060 in protest 145229–K, as to which the protest claim was abandoned, properly dutiable as a drug, advanced in value or condition, under paragraph 34 of the Tariff Act of 1930 at the rate of 10 per centum ad valorem, as claimed.

Further claim is made by plaintiff for classification under paragraph 1669 of the Tariff Act of 1930 as crude drugs, free of duty, as to certain merchandise invoiced as "Higado Concentrado 1:20 en Pasta,"covered by entry number 3260 and entry number 1892 in protest 145229–K herein, and as to merchandise invoiced as "Extracto de Higado 1:125," covered by entry number 1892 herein. It appears from the record, as here presented, that these products are in a liquid or paste form and have not been reduced to a dried or powdered form. It further appears from the testimony of plaintiff's witness, Nicola, that in such condition they have not been advanced beyond the stage essential to the proper packing of the drugs or the prevention of decay or deterioration pending manufacture (direct interrogatory Nos. 33 and 34). The processing of these products from the beef livers results in the obtaining of commodities which conform to the statutory definition of a crude drug.

Beef liver extract in paste form has been held to be a crude drug. *United States* v. *Judson Sheldon*, 33 C. C. P. A. (Customs) 73, C. A. D. 318. Similarly, the involved merchandise which was invoiced as "Extracto de Higado 1:125," liver extract, produced from the beef livers which contains only the desired therapeutic element and which has not been advanced, is a crude drug. Accordingly, the invoiced products in paste and liquid forms are properly free of duty under paragraph 1669 of the Tariff Act of 1930, as claimed.

While counsel for the plaintiff stated at the hearing that he had "no quarrel" with the collector's classification of certain "beef liver extract designated as 1:125" as advanced drugs under paragraph 34 of the act here in question at the rate of 10 per centum ad valorem (R. 14), apparently such concession did not apply to all importations of this type, and a claim for classification of certain merchandise of this character under paragraph 1669 of the act as a crude drug, properly free of duty, is pressed by counsel for the plaintiff in his brief. While the statement of counsel, as noted, lends confusion to the record, we

observe that by proper amendment certain merchandise invoiced as "Extracto de Higado 1:125," covered by entry No. 1892 herein, is claimed properly free of duty under paragraph 1669 of the Tariff Act of 1930 as a crude drug.

For the aforesaid reasons, the relevant claims in these protests are sustained. Judgment will be entered accordingly.