**ORGANON, INC.**

v.

**UNITED STATES.**

**C.D. 3170; Protest Nos. 61/1270–12955–60.**

United States Customs Court,
First Division.

Oct. 23, 1967.

Barnes, Richardson & Colburn, New York City (Earl R. Lidstrom and Joseph

Schwartz, Chicago, Ill., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Harold L. Grossman, New York City, Trial Atty.), for defendant.

Before WATSON and BECKWORTH, Judges.

WATSON, Judge.

The merchandise involved in the case at bar is described on the invoice as "A.C.T.H. (Cortrophin Powder C.M.C.)", and consists of certain adreno-cortico-trophic hormones commonly known and referred to as "ACTH", used in medicine for the treatment of certain diseases.

The importation in question was classified for duty under paragraph 5 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the rate of 12½ per centum ad valorem as a nonalcoholic medicinal preparation, not specially provided for. Plaintiff claims such merchandise properly dutiable under paragraph 34 of said act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at the rate of 5 per centum ad valorem, as a drug, advanced in value or condition. Plaintiff alternatively had claimed that said merchandise is properly classifiable free of duty under the provisions of paragraph 1669 of the Tariff Act of 1930, as a drug in a crude state, not advanced in value or condition. However, at the hearing of this case, counsel for the plaintiff formally abandoned this claim (R. 2).

The pertinent provisions of the Tariff Act of 1930 herein involved are as follows:

Paragraph 5, Tariff Act of 1930, as modified by T.D. 52739:

All chemical elements, all chemical salts and compounds, all medicinal preparations and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for * * * ........ .................. 12½% ad val.

Paragraph 34, Tariff Act of 1930, as modified by T.D. 51802:

Drugs, such as barks, beans, berries, * * * and all other drugs of vegetable or animal origin * * * ; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol ...... 5% ad val.

Paragraph 34, Tariff Act of 1930, reads in part:

*Provided,* That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: * * *.

The record in this case consists of the testimony of Mr. Berend Drenth, employed as factory chemist by N. V. Organon, of Oss, Netherlands, the shipper of the involved merchandise, taken by deposition (the direct interrogatories and answers thereto and the cross interrogatories and answers thereto were admitted in evidence as plaintiff's exhibit 1–A and 1–B respectively), for the plaintiff, and also the testimony of Dr. Earl Pierson, employed by Merck and Co., Inc., Rahway, New Jersey, called as a witness on behalf of the defendant. Attached to the deposition of plaintiff's witness Drenth, is a so-called "Flowsheet" (exhibit A in plaintiff's exhibit 1–A) de-

scribing the manufacturing processes employed in the production of the imported product.

The "Flowsheet" above mentioned describes the various steps in the production of the imported product as follows:

### FLOWSHEET OF THE MANUFACTURING PROCESS FOR A.C.T.H.

Dehydration of frozen pituitary glands with acetone.

↓

Mechanical separation of the dried pituitaries into anterior and posterior lobes.

↓

Grinding of the anterior lobes.

↓

Treatment of the anterior lobe powder with methanolic ammonia at room temperature for 1 hour (This treatment is repeated twice)

↓

Separation of the residue by filtration ——————→ Discard filtrate.

↓

Extraction of the residue with 95% acetic acid in acetone, for 45 minutes at 70°C. (this extraction is repeated twice).

↓

Separation of the residue by filtration ——————→ Discard residue after 3rd extraction.

↓

Precipitation with acetone and ether at 5°C.

↓

Filtration and washing of the precipitate ——————→ Discard filtrates

↓

Extraction of the precipitate with 77% acetone-hydrochloric acid at pH 1, 6 at room temperature for 1 hour (this extraction is repeated twice).

↓

Separation of the residue by filtration ——————→ Discard residue after 3rd extraction.

↓

Precipitation with acetone at pH 3, 0 and 5° C.

↓

Filtration and washing of the precipitate ——————→ Discard filtrates.

↓

Dissolving the precipitate in O, 1 N acetic acid.

↓

Clarification of the solution by centrifugation ⎤ ——————→ Discard residues.
followed by filtration ⎦

↓

Adsorption of the active principle on carboxy methyl cellulose (C.M.C.) and washing the C.M.C. adsorbate in an adsorption column.

(The adsorption on C.M.C. is repeated on the combined mother liquors). ⎫ Discard mother liquors.

↓

Elution of the active principle from the C.M.C. with 0, 1, ⎤ →Discard
N hydrochloric acid ⎬ residual
⎦ C.M.C.

Treatment with Dowex to remove chlorine ions.

Clarification of the eluate by filtration through sintered-glass-filter (G5)

Lyophilization of the clear filtrate.

The lyophilized powder obtained from this process after testing and release is exported to the U.S.A. as Cortrophin powder C.M.C.

———◆———

Plaintiff's witness Drenth testified substantially as follows: That he was personally familiar with the production of the imported merchandise, having supervised "the manufacturing of said product" (R. 6); that each step in the production of the imported merchandise is set forth in the "flowsheet" marked exhibit A; that the further purification steps "do not effect any destruction of the extracted ACTH"; and that the hormone is present in the pituitary as a separate entity not bound to other cellular material" (R. 11). Mr. Drenth further testified that, based upon his experience in the production of the imported merchandise, the processes of production described in the flowsheet, plaintiff's exhibit A, "is not aimed at the isolation of the pituitary hormone. It can be characterized as a purification process which leads to a concentration of the above principle so that it is obtained in a stable form" (R. 14–15).

In response to cross-interrogations, plaintiff's witness testified as follows: That, as a result of the treatment of the pituitary glands as set forth in the first five steps of the flowsheet, a residue is obtained which is further treated to produce ACTH, the imported product. In the opinion of the witness, no chemical reaction takes place in step 6 as described in the flowsheet, wherein a portion of the residue from step 5 has chemically combined with the acetic acid, because "The acetic acid used in step 6 merely acts as a solvent for the ACTH and some other proteins and peptides from the residue. This process is a physical one" (R. 17). Mr. Drenth further stated that the precipitate formed in step 8 by the addition of acetone and ether at 5°C is not "a crude form of the acetate of ACTH" but "is a mixture of natural components from the pituitary glands which contains the greater part of the ACTH present therein. The content of the ACTH in this mixture is very low and amounts to approximately 1%" (R. 17).

Plaintiff's witness further testified that the precipitate resulting from step 9 can be characterized as a portion obtained from the original pituitary gland and is soluble in acetone and ether at 5°C. This insoluble precipitate does not react chemically with the hydrochloric acid added in step 10 to form a soluble hydrochloride. The resulting solution is again a mixture of proteins and peptides in which the amount of ACTH is very small, but enriched over that resulting from step 8; that "it is not known in which form ACTH is present in the filtrate resulting from step 11. ACTH is present in the mixture to the extent of approximately 5 percent; that the precipitate shown in step 13 is not a chemical compound, or a salt of ACTH and hydrochloric acid (R. 20–21); that at step 14, about 95 percent of the precipitate obtained in step 13 dissolves in the 0.1 N acetic acid added at this stage. The remaining 5 percent is insoluble. A

chemical compound is not formed between ACTH and acetic acid, and no chemical reaction takes place between the two; that in step 16 carboxy methyl cellulose (C.M.C.) is used as an adsorbent. The chemical nature of the above principle adsorbed on "C.M.C." at step 16 is a mixture of peptides, and not a protein consisting essentially of a single chain of amino acids. The washing operation with 0.1 acetic acid in this step is not intended to free the adsorbed material from the C.M.C. (R. 23); that in step 17, a solution of hydrochloric acid is used to remove the active principle containing ACTH from C.M.C. In this step, the active principle does not combine with the hydrochloric acid to form a hydrochloride. At the conclusion of this manipulation, there is some active principle remaining in the discarded "C.M.C." (R. 23–24).

Mr. Drenth testified that in step 18, the material obtained as a solution in hydrochloric acid is treated with "Dowex", an ion exchange resin, to remove chlorine ions; that no chemical reaction takes place in steps 19 or 20 (R. 25), the solution merely being filtered through a glass filter. The imported article does not contain chlorine as one of the constituents of the molecule (R. 26). Plaintiff's witness further testified that the imported article, ACTH, exists as such in the pituitary glands and "can be extracted by the use of water alone" (R. 27). The witness stated, however, that water extraction is far from complete and takes a very long time, during which proteolytic enzymes would destroy the "ACTH" almost completely by their proteolytic action. (R. 27).

Defendant's witness, Dr. Earl Pierson, stated that his duties are to advise the executive director of development research of Merck & Co., the said executive director being in charge of the pilot plant, and the research and analytical department of the company. The witness holds the degrees of bachelor of arts and master of science from Kalamazoo College and a Ph. D. in chemistry from Purdue University. In the course of his 24 years with Merck & Co., Dr. Pierson has been a senior chemist, manager of process development activity and, since 1955, has been director of the process development department, having under his supervision some 75 professionally trained people and 50 nonprofessionals. He has had various professional papers published and is a member of the American Chemical Society and two chemical honorary fraternities (R. 29–32). Dr. Pierson testified that he has had experience with flowsheets, having prepared, analyzed and digested flowsheets many times during the period of his employment (R. 32), and stated that, in his opinion, some of the steps in the processing of the original material, as delineated in the flowsheet, involved chemical changes as opposed to merely physical changes in the material being processed (R. 33–34). In this connection, he testified in part as follows: That step 10 of the flowsheet involves "an extraction of a precipitate containing ACTH, with 77% acetone-hydrochloric acid at a pH of 1.6. A chemical change is involved in this extraction" (R. 34). The witness described ACTH as "a polypeptide consisting of 39 amino acids linked together in a chain. The following discussion then took place:

JUDGE WILSON: What is the end product? At the end of your flowsheet, what is your end product?

THE WITNESS: When you're through with the flowsheet, I believe it's ACTH, the adreno-corticotropic hormone.

JUDGE WILSON: What do you understand that to be?

THE WITNESS: A long chain—it's a polypeptide containing, I believe, 39 amino acids linked together in one chain, to give this polypeptide compound.

JUDGE WILSON: What's the difference between that, and the pituitary hog gland with which you started?

THE WITNESS: Of course, the gland is the whole gland, your Honor, consisting of various lobes, and I be-

lieve the ACTH is in the anterior lobe of the pituitary.

JUDGE WILSON: It still consists of part of that pituitary gland, is that right, your end product?

THE WITNESS: Yes.

JUDGE WILSON: So what it amounts to is the removal of part of it, and the leaving of part of it. Now, isn't it the same when we get through as it was when we started, except that it's separated from some other material?

THE WITNESS: I believe that is a moot point. I do not know whether it is exactly the same—

JUDGE WILSON: Well, it isn't substantially changed. It serves the same purpose, doesn't it?

THE WITNESS: I realize you're not a doctor, but the question as to whether it is sort of chemically detached from the pituitary I do not know.

JUDGE WILSON: But the whole process is designed to get some desired substance out of the pituitary gland, isn't it?

THE WITNESS: Yes, your Honor.

JUDGE WILSON: And they wind up with the substance they want?

THE WITNESS: Yes.

JUDGE WILSON: And they either wear away or wash away, somehow, the part they don't want, chemically and mechanically; is that right?

THE WITNESS: Right, yes [R. 35–36.]

The above testimony supports, in our opinion, the testimony of plaintiff's witness that the 21-step manufacturing process detailed in the flowsheet (plaintiff's exhibit A) resulted in no chemical change in the therapeutic ingredient, the so-called adreno-corticotrophic hormone (ACTH) because as stated by plaintiff's witness "The residue extraction procedure removes the ACTH or corticotropin * * * from the prime material in the same form in which it is present therein" (R. 11).

Defendant's witness further testified that step 12 involved a precipitation with acetone at a pH of 3 and 5 degrees centigrade, with the pH being lowered from 1.6 down to 3 by means of a buffer, entailed a chemical reaction caused by that change in pH (R. 37); that in step 14 wherein the precipitate is dissolved in one-tenth normal acetic acid, since the material did go in solution, there would be a reaction between acetic acid and the ACTH (R. 37); that in step 16, the adsorption of the ACTH on the carboxy methyl cellulose is due to a chemical reaction between the carboxy groups, the acid groups of the carboxy methyl cellulose, and the basic centers of the ACTH molecule (R. 37); that in step 17, wherein the active principle, the ACTH, is "eluded" from the carboxy methyl cellulose with hydrochloric acid, resulting in a "breaking of the chemical bond between the ACTH and the carboxy methyl cellulose in formation of a new bond with hydrochloric acid," there is a chemical reaction involved (R. 37–38); that in step 18, there is a chemical reaction involved by reason of the action of the "Dowex" and the ion exchanger with the hydrochloric and solution from step 17, there being a decided elevation of the pH due to the adsorption or reaction of the hydrochloric acid with the Dowex resin. (R. 38).

The Government's witness further set forth his disagreement with the responses of plaintiff's witness to certain of defendant's cross-interrogations as follows: That at step 10, there is a chemical reaction in which the acid reacts with the basic centers of the ACTH (R. 39); that at this stage, step 11, the ACTH is present in solution as a hydrochloride (R. 39); that at step 13, many chemical compounds would be present, the precipitate referred to in this step being "a salt of ACTH with hydrochloric acid" (R. 40), defendant's witness thus disagreeing with the answer given by plaintiff's witness in the cross-interrogatons that no chemical action was involved; that at step 14, "there will be a reaction between the acetic acid and the

ACTH" resulting in a salt formation by chemical reaction (R. 41). Dr. Pierson further testified that chemical compounds also resulted in the action at steps 17 and 18 (R. 42–44).

On cross-examination, defendant's witness testified that his opinion that a chemical reaction had taken place at steps 10, 12, 14, 16, 17, and 18 was based upon the shift in "pH" which occurs at each of those steps (R. 49). Dr. Pierson explained that "pH is a measure of the hydrogen ion concentration, and specifically it is the log of the reciprocal of the hydrogen ion concentration. A pH of 7 is neutral," that is, "The lower the number, the more acid; the higher the number, the more alkaline" (R. 49). In this connection, the defendant's witness stated that, in circumstances such as those at bar, where you have a shift in pH and there is something present with the acid with which it can react, "you must have a chemical reaction" (R. 50).

The issue in the case at bar is whether the imported product is a "medicinal preparation" (paragraph 5), as classified, or whether it is a "drug", natural and uncompounded, advanced in value or condition (paragraph 34), as claimed. On the issue here presented, plaintiff in its brief (page 12) states that "this case primarily involves a question of fact whether the record as a whole supports the plaintiff's contention that the imported ACTH was extracted from raw hog pituitaries without effecting a chemical change in the therapeutic ingredient." Defendant, on the other hand, contends "that the treatment of the original starting material, the pituitary gland of the hog, before exportation, involved chemical changes or reactions and, accordingly, the merchandise cannot be classified under paragraph 34, supra" (defendant's brief, page 10). As agreed to by the attorneys for the respective parties herein, the "real" issue in this case is based upon the plaintiff's claim that the process described by its witness, plaintiff's exhibit A, consists of a cleansing and purifying process, as opposed to the contention of the Government that the process in question is one which changes the initial material from a crude drug to a medicinal drug by chemical reactions or changes. (R. 28–29).

■ It has been well settled by judicial authorities that for a product to be properly classifiable under paragraph 34 of the Tariff Act of 1930 as a drug advanced in value, or condition, it must be established that (1) the source material or substance from which the imported product is obtained must have had therapeutic properties (2) that the product under consideration is "natural" and "uncompounded" and (3) that the substance has been advanced in condition by a process or treatment permissible under the statute. Organon, Inc. v. United States, 47 Cust.Ct. 205, C.D. 2303, affirmed in Organon, Inc. v. United States, 50 CCPA 17, C.A.D. 812; Chemical Specialties Co., Inc. v. United States, 34 Cust.Ct. 155, C.D. 1698, affirmed in Chemical Specialties Co., Inc. v. United States, 43 CCPA 93, C.A.D. 614; Roche-Organon, Inc. v. United States, 35 CCPA 99, C.A.D. 378.

■ The term "natural and uncompounded" means that the drug under consideration must exist as such in the source material and cannot be synthesized. The imported product must be the same and have the same therapeutic property as in the natural state. *Roche-Organon, Inc.*, C.A.D. 378, supra; Judson Sheldon Corporation v. United States, 13 Cust.Ct. 65, C.D. 871, affirmed in United States v. Judson Sheldon Corp., 33 CCPA 73, C.A.D. 318; Sherka Chemical Co., Inc. v. United States, 33 CCPA 53, C.A.D. 316; G. D. Searle & Co. v. United States, 21 Cust.Ct. 112, C.D. 1138.

■ The *Sherka Chemical Co., Inc.,* and *Roche-Organon, Inc.* cases, supra, are also authorities for the proposition that extraction with solvents or concentration of a drug are permissible under the provisions of paragraph 34 of the tariff act for "advanced" drugs. On the other hand, it has been settled that the process of concentration cannot involve chemical

changes in the drug itself during concentration. *Organon, Inc.*, C.A.D. 812, supra; *Chemical Specialties Co., Inc.*, C.A.D. 614, supra. Accordingly, as heretofore noted, the issue in this case primarily involves a question of fact whether the record as a whole supports the contention of the plaintiff that the imported ACTH was extracted from raw hog pituitaries without effecting a chemical change in the therapeutic ingredient.

The imported product is "uncompounded", that is, the desired therapeutic ingredient has not been combined with other ingredients so as to result in a compounded substance. *Frederick Stearns & Company, et al. v. United States*, 34 Cust.Ct. 1, C.D. 1167 (beef liver concentrate in powder form). *United States v. Judson Sheldon Corp.*, supra (beef liver extract). No such combination is indicated by the record in this case. There is only a wearing away or removal of undesired material surrounding the active ingredient, ACTH (R. 36).

■ The record in this case establishes in the first instance, in our opinion, that "ACTH" as such exists naturally in the hog pituitary glands from which it was extracted and, further, that it is not bound to other cellular material. Plaintiff's witness, Drenth, as heretofore indicated, testified to this fact, basing this conclusion upon his own experience and upon certain other authorities cited by him. No evidence has been presented in this case to contradict this testimony. As a matter of fact, defendant's witness appears to be in agreement on this point with the testimony of that of the witness for the plaintiff. In response to questioning from the court, Dr. Pierson stated that the pituitary hog gland "is the whole gland * * * consisting of various lobes, and I believe that the ACTH is in the anterior lobe of the pituitary and that the end product still consists of part of that pituitary gland" (R. 35). In this connection, Dr. Pierson further testified that he did not know whether the imported substance existed as such in the source material from which it was obtained (R. 45) and then stated that he, himself, had never "made an analysis of the pituitary gland of a hog, to determine whether or not it does exist as such" (R. 46).

In the *Chemical Specialties Co., Inc.*, case, supra, the imported "21-acetoxy pregnenolone" was classified under paragraph 5 of the Tariff Act of 1930 as a medicinal preparation, not specially provided for. It was principally claimed properly classifiable under paragraph 34 of said act as a drug advanced in condition. It was stipulated by counsel therein that the imported product was produced by a series of chemical steps from a yam commonly known as the "cabeza de negra", and that these steps culminated in the production of "21-hydroxy pregnenolone". It further appeared that the latter product was acetylated with acetic anhydride, thus forming "21-acetoxy pregnenolone", was not a "natural" drug within the meaning of paragraph 34, supra; and that the merchandise there imported was not an advancement of its predecessor material, but was in itself a distinct chemical entity, since the source material, the *cabeza de negra*, was completely destroyed and its identity lost. The substance in question was held properly dutiable under paragraph 5 of the tariff act as a medicinal preparation, as assessed. Our Appellate Court in the *Chemical Specialties* case, supra, likewise held that the product there under consideration was not a "natural" drug and that it was "compounded" by a series of chemical reactions and, in further affirming the holding of this court that the 21-acetoxy pregnenolone was not an "advanced" drug, 43 CCPA at page 98, stated:

> * * * However, we know of no case which has gone so far as to include chemical changes within the meaning of the above-quoted phrase, and we are of the opinion that the chemical change involved in the present case is not included in the meaning of "advanced" as it appears in paragraph 34, supra.

In the *Organon, Inc.,* case, supra, the merchandise consisted of certain "Heparin Sodium" which was classified under paragraph 5 of the Tariff Act of 1930, as modified, as a medicinal preparation, not specially provided for. It was claimed properly free of duty under paragraph 1669 of said act as a crude drug or, alternatively under paragraph 34 of the act, as modified, as a drug advanced in condition. The court therein, in passing upon the respective claims of the appellant, 50 CCPA at page 19, stated:

> * * *, it is contended that the imported merchandise is still a drug and dutiable as an advanced drug rather than a medicinal preparation not specially provided for. Appellant urges that a mere isolation process brought about by chemical reaction does not prevent a drug from being classified under paragraph 1669 nor that a mere advance brought about by chemical reaction does not prevent a drug from being classified under paragraph 34.

The court, page 20, further stated:

> The provision of paragraph 34 relative to therapeutic properties, supra, indicates that the determination of the issue involved *requires deciding* whether Heparin as it is found in the animal tissue possesses *therapeutic properties*. From the case law it is further apparent that we must determine whether the pre-importation treatment causes chemical changes in the material being processed. [Emphasis quoted.]

In its decision, our Appellate Court notes that the parties agreed that the process of hydrolyzing the issue containing the Heparin involved a chemical change, and pointed out that, "In fact, there is controverted testimony that the process creates new chemical products." In holding the involved Heparin dutiable as a medicinal preparation, as classified, the court, page 22, concluded:

> From reading the testimony as a whole it appears that the *basic chem-*

*ical structure* which confers on Heparin Sodium USP XV its specific *therapeutic properties* is present in the Heparin when it is tied to a protein, but the *therapeutic properties per se* are *not* present until the Heparin is set free from the protein through a chemical reaction. On the basis of the record before us, it cannot be said that the Heparin as found in the animal tissue before it is freed from the protein is a drug which has "therapeutic or medicinal properties." Also it is clear that the treatment of the original starting material before export does involve a chemical change. Therefore, the merchandise cannot be classified under paragraph 34 or paragraph 1669. [Italics quoted.]

In our opinion, based upon the testimony adduced in this record, the product here under consideration differs from that involved in the *Chemical Specialties Co.* case (C.A.D. 614) and the *Organon, Inc.,* case (C.A.D. 812), supra. Here, unlike the situation in the cited cases, the process employed to remove the ACTH from the pituitary gland does not change or alter the imported therapeutic ingredient at any stage. Significant in our conclusions herein is the testimony of defendant's witness, Dr. Pierson, in agreement, in our opinion, on this point. Under cross-examination he testified as follows:

> Q. Well, you're not stating that the chain of 39 amino acids which constitute ACTH are split in any way; are you?—A. I am not. (R. 46)

The witness further testified on cross-examination:

> Q. I believe you stated that ACTH is a polypeptide consisting of a chain of 39 amino acids; is that correct?— A. Yes.

> Q. If we take the flowsheet and work backwards, is there anything to indicate to you that the same chain of amino acids did not exist all the way back?—A. There is nothing that indicates to me that the chain wasn't intact all the way.

Q. So then it's fair to conclude that the same chain that we ended up with followed all the way back through the process; is that correct?—A. That is right. [R. 52.]

Plaintiff in the case at bar contends that no chemical reactions take place at steps 10, 12, 14, 16, 17, and 18 in the process indicated on the flowsheet. Specifically, plaintiff maintains that "during the entire process the batch consists of a mixture of polypeptides and other materials in solution" and that the shift in pH at those steps, which defendant's witness offers for his conclusion that chemical reactions take place at those steps, pertains to the "solution" and not necessarily to ACTH; second, that a change in pH only indicates "that the number of basic centers in the solution has changed, and does not indicate that ACTH has changed"; third, that the shift in pH is partially accounted for by the elimination of other peptides after each step (plaintiff's brief page 16). We are of opinion that these contentions are supported by the record in this case. In this connection, defendant's witness testified as follows:

Q. Is it possible that the pH shift at each one of those steps, 10, 12, 14, 16, 17 and 18 that you described resulted from the elimination of other polypeptides in the solution?—A. To an exceedingly minor extent * * * such is possible. * * *

* * * * * *

Q. I believe that after each one of those steps we have a further concentration of ACTH in solution. Would that be your understanding too?—A. That's my understanding. Yes.

Q. So that there is at each one of these steps an elimination of some polypeptides?—A. That is my understanding. Yes. [R. 50–51.]

With respect to the prior testimony of the Government's witness as to an alleged union between the carboxy groups of carboxy methyl cellulose with ACTH, it was further brought out on cross-examination of Dr. Pierson that carboxy methyl cellulose (C.M.C.) is a solid material, its only function being to attract or absorb material containing ACTH. Further there is nothing about the cellulosic material, a stable compound, which would indicate that it loses any of its carboxy groups and "the likelihood of its losing any of its groups is very slight" (R. 53).

The record discloses that the Government's witness recognized Dr. Heinz Fraenkal-Conrat as an authority on the subject of proteins. In a publication on the matter, in a volume entitled "Amino Acids and Proteins", compiled and edited by David M. Greenberg, Ph. D., chapter IX, under the heading "Chemical Reactions of Proteins", Dr. Conrat in classifying chemical reactions of proteins, at page 532, stated:

II. Reactions involving only Secondary or Ionic Bonds [under which are listed]: 1. Denaturation. 2. Masked protein groups. 3. Effects of Detergents. 4. Miscellaneous [covering], "Production of Naturation" [and] "Determination of isoelectric point of soluble proteins by means of detergents."

It is not contended herein by either party that any primary bonds have been affected, and consideration of the issue herein revolves around the question of "denaturation". At page 536, in volume "Amino Acids and Proteins", supra, it is stated:

II REACTIONS INVOLVING ONLY SECONDARY OR IONIC BONDS

1. Denaturation

Denaturation has been variously defined. Most generally, denaturation appears to be regarded as the sum of all changes involving only coordinate or ionic bonds, which lead to detectable alterations in the molecular structure. It should be recognized that aggregation, which may or may not lead to precipitation or coagulation at the isoelectric point frequently follows, but is not necessarily a part of denaturation.

Denaturating agents or conditions are such as can disrupt coordinate and ionic, but not primary bonds. The more common denaturing agents include moderate heat, surface forces, ultraviolet light, hydrogen and hydroxyl ions (of sufficiently low concentration not to cause cleavage of peptide, amide, or disulfide, bonds); and certain watermiscible organic solvent and solutes in high concentrations, such as alcohols, urea, detergents, etc. Different proteins differ greatly in their susceptibility to denaturation by different agents. * * *

In the case at bar, while there appears to be certain attractions of one ion to another, the process takes place without disturbing the chain of amino acids involved.

On cross-examination, the witness for the defendant "would not say" that ACTH which results from the process indicated on the flowsheet has been "denatured" (R. 56). Further, the witness stated that "he would not say" that if a protein has not been denatured, "it has not undergone a chemical reaction." This latter opinion expressed by the defendant's witness is thus in contradiction to the opinion of Dr. Conrat, recognized by the witness as an authority on the subject of proteins. As heretofore indicated, denaturation appears to be regarded as "the sum of all changes involving only coordinate or ionic bonds, which leads to detectable alterations in the molecular structure." Dr. Pierson defined "denatured" as "a further chemical reaction, possibly brought about by heat, by formaldehyde, by acids, so that new chemical bonds are formed rendering the protein obviously different from what it was initially" (R. 57). However, as previously indicated by the record herein, the chain of 39 amino acids which constitute ACTH remains "intact" during the entire process here employed to obtain the ACTH (R. 52). In our evaluation of the contradictory conclusions of both witnesses herein, specifically as to whether there were chemical changes in the production of the imported ACTH so as to alter the molecular structure of the protein, we deem it relevant in our determination of the question here presented, to note that the company by which the defendant's witness was employed does not manufacture ACTH, and, further, that the defendant's witness had never seen the manufacture of ACTH nor had he ever "analyzed any of the precipitates or extracts which are indicated on this flowsheet (R. 53–54)."

■■ For all of the reasons heretofore stated, we are of opinion, first, that ACTH as such exists naturally in hog pituitary glands from which it is extracted; second, that the imported ACTH was not effected by chemical changes which altered the ACTH which was originally present in the pituitary gland, and that the imported product is a drug which has been advanced in condition and purified so as to obtain the therapeutic ingredient in a more stable form. Accordingly, we hold the imported merchandise properly classifiable at the rate of 5 per centum ad valorem under the provisions of paragraph 34 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, as a drug which is "natural" and "uncompounded", not edible, advanced in value or condition by the processes permissible under said paragraph, as claimed. The protest is sustained. Judgment will issue accordingly.